ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

KATHERINE L. WAWRZYNIAK (CABN 252751)
Chief, Criminal Division

BENJAMIN K. KLEINMAN (NYBN 5358189)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    benjamin.kleinman2@usdoj.gov

Attorneys for United States of America

**FILED**

Jun 15 2023

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.4:23-mj-70876-MAG |
| Plaintiff, | NOTICE OF PROCEEDINGS ON OUT-OF-DISTRICT CRIMINAL CHARGES PURSUANT TO RULES 5(c)(2) AND (3) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE |
| v. | |
| ROBERT GODINEZ, | |
| Defendant. | |

Please take notice pursuant to Rules 5(c)(2) and (3) of the Federal Rules of Criminal Procedure that on June 15, 2023 the above-named defendant was arrested pursuant to an arrest warrant (copy attached) issued upon an

    ☐    Indictment

    ☐    Information

    ■    Criminal Complaint

    ☐    Other (describe) _____

pending in the Eastern District of California, Case Number 2:23-mj-0091 CKD.

In that case (copy of criminal complaint attached), the defendant is charged with a violation of:

v. 7/10/2018

COUNT 1:     21 U.S.C. §§ 846, 841(a)(1) - Conspiracy to Distribute Over 500 Grams of a mixture containing Methamphetamine.

COUNT 2:     21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute at least 100 Grams of a mixture containing Methamphetamine.

PENALTIES:

COUNT 1: Mandatory minimum of 10 years in prison and a maximum of up to life in prison; or

Fine of up to $10,000,000; or both fine and imprisonment

Supervised release of at least 5 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)

COUNT 2: Mandatory minimum of 5 years in prison and a maximum of up to 40 years in prison; or

Fine of up to $5,000,000; or both fine and imprisonment

Supervised release of at least 4 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)

Date: June 15, 2023                          Respectfully Submitted,

ISMAIL J. RAMSEY
United States Attorney


 /s/ *Benjamin K. Kleinman*
BENJAMIN K. KLEINMAN
Assistant United States Attorney

v. 7/10/2018

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

**Jun 13, 2023**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| United States of America<br>v.<br><br>ROBERT GODINEZ | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No.<br><br>2:23-mj-0091 CKD |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____August 30, 2019_____ in the county of _____San Joaquin_____ in the

____Eastern____ District of ____California____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute of at least 500 grams of mixture or substance containing a detectable amount of Methamphetamine |
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute of at least 100 grams of a mixture or substance containing a detectable amount of heroin |

This criminal complaint is based on these facts:

See Affidavit of FBI Special Agent Brian Toy, attached hereto and incorporated by reference.

☒  Continued on the attached sheet.

/s/
*Complainant's signature*

Brian Toy, FBI Special Agent
*Printed name and title*

Sworn to me and signed via telephone.

Date:  ____June 13, 2023 at 9: 33 am____

*Judge's signature*

City and state:  ____Sacramento, CA____

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

I.    INTRODUCTION ............................................................................................... 1

II.   AFFIANT'S GENERAL TRAINING AND EXPERIENCE ............................................. 2

III.  PROBABLE CAUSE ........................................................................................... 5

   A.   SYNOPSIS AND BACKGROUND ......................................................................... 5
   B.   THE CONFIDENTIAL SOURCES ........................................................................ 7
        CS1 .......................................................................................................... 7
        CS2 .......................................................................................................... 8
   C.   THE TARGET SUBJECTS' CRIMINAL HISTORIES AND ROLES IN THE F. REYES DTO ...... 9
        1.   ARREDONDO-GARCIA .......................................................................... 9
        2.   G. VERDUGO ...................................................................................... 9
        3.   J. VERDUGO ..................................................................................... 10
        4.   ZAPATA ............................................................................................ 10
        5.   GODINEZ .......................................................................................... 11
        6.   W. REYES ......................................................................................... 11
   D.   OVERT ACTS COMMITTED BY TARGET SUBJECTS ............................................... 11
        1.   July 10, 2019 – F. REYES sold CS2 1 lb. of methamphetamine supplied by J.
             VERDUGO ......................................................................................... 11
        2.   August 23, 2019 – F. REYES sold CS2 6 lb. of methamphetamine supplied by J.
             VERDUGO ......................................................................................... 16
        3.   August 30, 2019 – F. REYES sold GODINEZ 2 lbs. of methamphetamine and ½ lb. of
             heroin supplied by J. VERDUGO; Police seize these drugs from GODINEZ during traffic
             stop 19
        4.   October 7, 2019 – FBI seizure of 50 lbs. of methamphetamine in Omaha, NE involving
             F. REYES, ZAPATA, J. VERDUGO, and ARREDONDO-GARCIA ....................................... 24
             a)   F. REYES and ZAPATA purchased a load vehicle. .................................................. 24
             b)   Shipment Destination Provided by J. VERDUGO ...................................................... 27
             c)   Shipment of Escape and Seizure of 50 Pounds of Methamphetamine ........................ 30
             d)   Identification of ARREDONDO-GARCIA as the supplier of the 50 pounds of
                  methamphetamine ................................................................................................. 32
             e)   December 7, 2019 – Conversations between J. VERDUGO and J. ARRENDONDO
                  after discovering the 50 lb. seizure of methamphetamine. ........................................ 40
             f)   August 24, 2022 – Interview of J. VERDUGO regarding 50 lbs. methamphetamine
                  seizure on October 7, 2022. ................................................................................... 42
        5.   October 19, 2020 – FBI seizure of 21 lbs. of methamphetamine in Allentown, PA
             involving F. REYES, ZAPATA, W. REYES, J. VERDUGO, and G. VERDUGO ..................... 43
             a)   F. REYES and ZAPATA obtain a load vehicle ......................................................... 43
             b)   J. VERDUGO supplied F. REYES with 18 pounds of methamphetamine from G.
                  VERDUGO ............................................................................................................ 45
             c)   ZAPATA Arranged a Vehicle Transport of a load vehicle on October 9, 2019 at the
                  Request of F. REYES ............................................................................................. 49
             d)   J. VERDUGO delivered a duffle bag to F. REYES ................................................... 51

e)  Interstate transportation of a silver Infiniti QX4 on October 9, 2019, containing 21 pounds of methamphetamine ........................................................................... 52

f)  Death of F. REYES and seizure of 21 lbs. of Methamphetamine from the Infiniti QX4 on October 23, 2019 ........................................................................................ 53

g)  Post-Seizure Phone Conversations ........................................................... 56

h)  October 29, 2019, Interview of ZAPATA ................................................. 60

i)  ZAPATA's knowledge of methamphetamine concealed in the QX4. .................. 62

6.  *November 1, 2019 – W. REYES brokered a 4 lb. methamphetamine deal between CS2 and J. VERDUGO.  J. VERDUGO had C.C. deliver the methamphetamine* ...................... 64

7.  *December 11, 2019 – J. VERDUGO sold CS2 ½ lb. heroin supplied by ARREDONDO-GARCIA and delivered by C.C.* .................................................................................. 67

E.  PROBABLE CAUSE FOR RESIDENCES AND PHONE NUMBERS ............................................... 69

1.  *Probable Cause to Believe that ARREDONDO-GARCIA Currently Resides at ARREDONDO-GARCIA's Residence.* ...................................................................................... 69

2.  *Probable Cause to Believe that ZAPATA Currently Resides at ZAPATA's Residence and is Using ZAPATA'S Phone.* .............................................................................................. 70

3.  *Probable Cause to Believe that W. REYES Currently Resides at W. REYES' Residence and is Using W. REYES' Phone.* .................................................................................................. 70

IV.  TRAINING AND EXPERIENCE REGARDING CELLULAR TELEPHONES AND PRECISE LOCATION DATA ................................................................................................. 71

V.  AUTHORIZATION REQUEST REGARDING APPLICATION FOR WARRANTS TO OBTAIN PRECISE LOCATION DATA FROM A CELLULAR TELEPHONE ........ 72

VI.  REQUEST FOR SEALING ................................................................................................. 73

VII. CONCLUSION ................................................................................................................. 74

# I.      **INTRODUCTION**

I, Brian Toy, Special Agent, U.S. Department of Justice, Federal Bureau of Investigation (FBI), being duly sworn, state:

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following people, premises, and property described below. This affidavit also supports my application for arrest warrants of the TARGET SUBJECTS for the offenses listed on the applications for arrest warrants.

| Attachment | Person/Property | Process Sought |
|---|---|---|
| | **TARGET SUBJECTS** | |
| | Jorge Omar ARREDONDO-GARCIA (ARREDONDO-GARCIA), DOB XX/XX/1978 (TT#8 & TT#9) | |
| | Gregorio Ontiveros VERDUGO (G. VERDUGO), DOB XX/XX/1983 (TT#6 and TT#7) | |
| | Jose Manuel Ontiveros VERDUGO (J. VERDUGO), DOB XX/XX/1985 (TT#4 & TT#5) | Complaint & Arrest warrants |
| | Alberto Navarro ZAPATA (ZAPATA), DOB XX/XX/1986 (TT#3) | |
| | Roberto GODINEZ (GODINEZ), DOB XX/XX/1972 | |
| | Wilfredo F. REYES (W. REYES), DOB XX/XX/1974 | |
| | **TARGET LOCATIONS** | |
| A-1 | 242 Acacia St, Lodi, CA (ARREDONDO-GARCIA's RESIDENCE) | |
| A-2 | 9709 Fountain Valley Dr, Stockton, CA (ZAPATA'S RESIDENCE) | Search warrant (for arrests) |
| A-3 | 1117 Mt Etna Ln, Manteca, CA (W. REYES' RESIDENCE) | |
| | **TARGET CELLULAR PHONES** | |
| A-4 | (209) 275-2975 (ZAPATA'S Phone) | Precise location data warrants (for arrests) |
| A-5 | (925) 567-4149 (W. REYES' Phone) | |

2.      The items to be searched are further described in Attachments A-1 through A-5.  The applications seek to search the location for the things described in Attachments B-1 through B-5.  As explained throughout this affidavit, and specified on the relevant attachments, I believe these TARGET SUBJECTS have committed the TARGET OFFENSES described below. This affidavit also supports my Affidavit

application for arrest warrants for the TARGET SUBJECTS for the offenses identified in the table below.

| Target Subjects | Target Offenses | Dates |
|---|---|---|
| ARREDONDO-GARCIA, GREGORIO ONTIVEROS VERDUGO, JOSE MANUEL ONTIVEROS VERDUGO, ALBERTO NAVARRO ZAPATA, and, WILFREDO REYES | Conspiracy to Distribute, and to Possess with Intent to Distribute, over 500 grams of mixture or substance containing a detectable amount of Methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) | 7/10/2019 – 12/11/2019 |
| ROBERT GODINEZ | Possession with Intent to Distribute of at least 500 grams of mixture or substance containing a detectable amount of Methamphetamine, in violation of 21 U.S.C. 841(a)(1) | 8/30/2019 |
|  | Possession with Intent to Distribute of at least 100 grams of a mixture or substance containing a detectable amount of heroin, in violation of 21 U.S.C. 841(a)(1) | 8/30/2019 |

## II.     AFFIANT'S GENERAL TRAINING AND EXPERIENCE

3.     I, Brian Toy, Special Agent, U.S. Department of Justice, Federal Bureau of Investigation (FBI), being duly sworn, state:

4.     I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, § 2510(7), empowered to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, § 2516.

5.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have served in this role since May 2010.  I am currently assigned to the Sacramento Division, Stockton Resident Agency.  Prior to becoming a Special Agent, I completed 20 weeks of training (the FBI's Special Agent Basic Training Program) at the FBI Training Academy, Quantico, Virginia.  During this program, I received extensive training on all aspects of investigations and investigative methods, including human source handling, physical and electronic surveillance, interrogation methods, drug identification, criminal enterprises, drug trafficking, and financial investigations.  Additionally, I have received training in undercover investigations related to narcotics trafficking, which included investigative techniques and

common subject behavior.

6.      While serving as an FBI Special Agent, I have investigated criminal violations relating to criminal street gangs, violent crime, and narcotics.  I have participated in all aspects of criminal investigations, including interviews, physical surveillance, execution of search warrants, and the arrest of criminals.  I have personally investigated and/or assisted other agents and officers in their investigations involving violations of Title 21, United States Code, Section 841(a)(1), the manufacture, distribution, and possession with intent to distribute controlled substances; and Title 21, United States Code, Section 846, conspiracy to commit the foregoing.  Specifically, those investigations have focused on the distribution of methamphetamine, marijuana, cocaine, heroin, and other narcotics.  I am familiar with, and have participated in conventional investigative methods, including electronic surveillance, visual surveillance, the use of GPS/E-911 data, questioning witnesses, applying for and executing search warrants, handling confidential informants, and using pen registers and trap-and-trace devices.

7.      Through my training and experience, I have become familiar with the identification of various controlled substances, and the various methods used by drug traffickers to obtain, possess, transport, and/or sell controlled substances.  During my employment with the FBI, I have interviewed drug dealers, users, and confidential informants and have discussed with them the lifestyle, appearances, and habits and methods of drug dealers and users.  I have had the opportunity to talk with admitted and known drug traffickers as to their methods, and those of their associates, regarding the manufacture, importation, transportation, distribution and sales of controlled substances, as well as their methods used to conceal, transport, and launder cash and/or other types of drug proceeds.  I have become knowledgeable in the methods used by drug traffickers to import, conceal, transport, distribute, manufacture, and sell controlled substances, as well as the methods used to conceal, transport, and launder cash and/or other types of drug proceeds.  Through prior investigations and training, I have become familiar with the types and amounts of profits made by drug dealers, and the methods, language, and terms used by persons dealing illegal substances.  I know that drug traffickers often communicate with their associates through cellular telephones and landline telephones.  In addition, I know that drug traffickers frequently use multiple cellular telephones and landline telephones for a number of purposes, including to compartmentalize their illicit activities and associates; to separate illicit activity from

Affidavit                                                    3

legitimate activity; and to avoid detection from law enforcement.  I know that drug traffickers frequently change telephone numbers and cellular telephones in an effort to thwart law enforcement.  I know from my training and experience that drug traffickers often use fictitious names and identification when subscribing (i.e., opening) cellular telephone and landline telephone accounts.  I also know that drug traffickers put communications devices in the names of associates and/or relatives.  The use of these fictitious names and identifications, or placing communication devices in the names of associates or relatives, is designed to impede law enforcement investigations into the true subscriber and/or user of such communication devices.

8.      I have personally led and participated in investigations of drug trafficking organizations (DTOs) over the last twelve years.  I have interviewed members and associates of various DTOs.  During the course of these investigations, I have conducted consensual monitoring, physical surveillance, telephone analysis, wiretaps, search warrants, and arrest warrants.  I have been the affiant for six orders authorizing wire and electronic communications.  I have monitored wire and electronic communications in over half a dozen investigations.  I have conducted surveillance in support of over 12 wiretap investigations.  During these investigations, I have spoken to experienced investigators and prosecutors who have led and participated in other investigations to expand my knowledge base on drug trafficking organizations, their methods, and ways to exploit their weaknesses.

9.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

10.      With respect to my application for warrants to obtain precise location data from cellular phones, because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  See 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  See 18 U.S.C. § 3123(b)(1).

Affidavit                                           4

11.     This affidavit is intended to show that there is sufficient probable cause for the requested complaints, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of the investigation of this matter.

### III.     PROBABLE CAUSE

**A.     Synopsis and Background**

12.     In November 2017, an FBI confidential source ("CS1") reported that Francisco REYES[1] was a high-volume drug trafficker in Stockton and San Joaquin County, California.  As a result of that initial reporting, the FBI introduced a second confidential source ("CS2") to F. REYES.  In the months that followed, CS2 made a series of controlled narcotics purchases from F. REYES to determine the full scope of F. REYES' drug trafficking organization and the connections among its co-conspirators.

13.     The investigation revealed that F. REYES was, in fact, leading a poly-drug trafficking organization in and around San Joaquin County.  Law enforcement identified several of F. REYES' associates, as well as additional details about the DTO, which showed that it was sending drugs from Stockton, California, to Nebraska and Pennsylvania.

14.     On June 19, 2019, the Honorable John A. Mendez authorized the intercept of wire and electronic communications for F. REYES' Phones, (209) 298-5207 (here after "Target Telephone 1" or "TT#1") and (209) 405-4851 (TT#2).  Intercepts commenced on June 27, 2019, and were completed on July 26, 2019.

15.     On August 21, 2019, U.S. District Court Judge John A. Mendez authorized the intercept of wire and electronic communications for F. REYES' Phone, (209) 295-5207 (TT#1) and (209) 405-4851 (TT#2).   Intercepts commenced on August 22, 2019, and were completed on September 20, 2019.

16.     On September 30, 2019, the Honorable John A. Mendez authorized the intercept of wire and electronic communications for ZAPATA'S Phone, (209) 275-2975 (TT#3) and only wire communications for J. VERDUGO's PHONE, (209) 641-6046 (TT#4).  Intercepts commenced on October 1, 2019, and were completed on October 30, 2019.

17.     On November 26, 2019, the Honorable John A. Mendez authorized the intercept of wire

---

[1] Francisco REYES died on October 18, 2019.  His death was unrelated to this investigation

Affidavit

communications for J. VERDUGO's PHONE, (209) 279-8279 (TT#5), G. VERDUGO's PHONE, (209) 470-4340 (TT#6), G. VERDUGO's PHONE, (209) 405-7703 (TT#7), and ARREDONDO-GARCIA's PHONE (209) 279-6769 (TT#8).  During the interception period, ARREDONDO-GARCIA changed phone numbers.  That new number, (209) 641-5792 (TT#9) was authorized for interception under the same order.  Intercepts commenced on November 30, 2019, and were completed on December 29, 2019.

18.     During this investigation, CS2 conducted multiple controlled drug buys with F. REYES. On October 18, 2019, F. REYES died; his death was unrelated to this investigation.  After F. REYES died, CS2 was able to establish a relationship with F. REYES' brother, W. REYES, and with F. REYES' drug supplier, J. VERDUGO.

19.     Below is a list of some of the relevant controlled drug deals and drug seizures further detailed in this affidavit.  All drugs seized during the controlled drug deals referenced below tested presumptive positive for the presence of methamphetamine, cocaine, or heroin in a field test and/or tested positive in a laboratory analysis for methamphetamine, cocaine or heroin.

| Date | Narcotics Purchased / Seized | Purity | Price | Supplier(s) | Intended Recipient |
|---|---|---|---|---|---|
| 7/10/19 | 1 lb. meth (1B29) | 97% ± 6% | $2,000 | J. VERDUGO > F. REYES > | CS2 |
| 8/23/19 | 6 lbs. meth (1B31) | 74% ± 6% | $12,000 | J. VERDUGO > F. REYES > | CS2 |
| 8/30/19 | 2 lbs. meth (1B37) .5 lb. heroin (1B38) 50.4 g heroin (1B39) | 97% ± 6% | Seizure | J. VERDUGO > F. REYES > | GODINEZ (seized from GODINEZ during CHP traffic stop) |
| 10/7/19 | 50 lbs. meth (1B46, 1B47, 1B48) | 99-100% ± 6% | Seizure | ARREDONDO GARCIA > J. VERDUGO > F. REYES > (Transport managed by Zapata) | Unknown recipient in NE (seized by FBI) |
| 10/19/19 | 21 lbs. meth (1B84) | 100% ± 6% | Seizure | J. VERDUGO > G. VERDUGO > W. REYES > (Transport managed by Zapata) | Distributor in PA (but seized by FBI) |
| 11/1/19 | 4 lbs. meth (1B54) | 98% ± 6% | $4,000 | J. VERDUGO > W. REYES > | CS2 |
| 12/11/19 | ½ lb. heroin (1B55) | 31% ± 4% | $8,750 | ARREDONDO GARCIA > J. VERDUGO > | CS2 |

Affidavit

6

**B.    The Confidential Sources**

20.    For the purposes of this affidavit, these individuals are referred to as Confidential Source 1 ("CS1") and Confidential Source 2 ("CS2").  CS1 provided the initial intelligence on the F. REYES DTO while CS2 conducted every controlled narcotics purchase in the investigation.

*CS1*

21.    CS1 has a 2003 juvenile adjudication for taking a vehicle without the owner's consent; a 2005 juvenile adjudication for grand theft from a person; a 2009 felony conviction for transportation of a controlled substance; a 2011 felony conviction for possession of an assault weapon; multiple felony convictions in 2013 for transportation of a controlled substance, possession of a controlled substance for sale, and possession of an assault weapon; and a 2015 felony conviction for felon in possession of a firearm.  CS1 was cooperating in this investigation in exchange for sentencing consideration on his/her 2015 felony conviction.

22.    In 2017, CS1 became a Defendant/Informant for the Stockton Police Department's (SPD) Gang Violence Suppression Unit (GVSU).  At the time, CS1 provided information in hopes of receiving consideration on a pending gun charge.  In doing so, CS1 provided information regarding gang activity occurring in Stockton.  CS1 also assisted with information that led to the apprehension of a fugitive from justice.  CS1 subsequently assisted the FBI with beginning the investigation into the F. REYES DTO.

23.    CS1 was subject to the FBI's direction and control during this investigation.  In November 2017, CS1 introduced CS2 to F. REYES.  CS1 was in a position to provide information regarding the F. REYES DTO's drug-trafficking activities and ultimately provided detailed information to the FBI about the F. REYES DTO's drug-trafficking practices, including names, telephone numbers, and modes/methods of operation.  The information provided by CS1 led to the identification of F. REYES.  CS1's information regarding the F. REYES DTO has been independently corroborated throughout this investigation by me and other law enforcement officers and databases.  To my knowledge, CS1 has not provided me or any other investigator with any false information about the F. REYES DTO.  For these reasons, I consider the information CS1 has provided regarding the F. REYES DTO to be reliable in this investigation.

24.    In September 2018, I learned that CS1 was involved in criminal activity regarding an

Affidavit                                          7

ongoing Stockton Police Department investigation.  The criminal activity was not related to the investigation into the F. REYES DTO.  Upon learning of this criminal activity, CS1 was notified that he/she would no longer be assisting the FBI and CS1 was not contacted by agents for any further information regarding the F. REYES DTO.  In October 2018, CS1 was subsequently arrested for his/her involvement in the Stockton Police Department investigation.  CS1 was arrested for violations of California Health and Safety Code, Section 11378 - possession of a controlled substance, methamphetamine; Health and Safety Code, Section 11379 - transportation of a controlled substance, methamphetamine; California Penal Code, Section 29800(a)(1) - felon in possession of a firearm; Penal Code, Section 186.22(a) - participation in a criminal street gang; and Penal Code, Section 186.22(b) - gang enhancement.

### CS2

25.     CS2 has a 1993 juvenile adjudication for burglary and taking a vehicle without the owner's consent; a 2007 felony conviction for first degree burglary; a 2009 felony conviction for first degree burglary and obstruct/resists public officer; a 1996 juvenile adjudication for receiving known stolen property and minor in possession of concealable firearm; a 1997 juvenile adjudication for burglary; a 2007 felony conviction for first degree burglary; and a 2012 misdemeanor conviction for carrying a concealed weapon without a permit in prohibited public building.  CS2 is working in exchange for monetary compensation.

26.     CS2 was subject to the FBI's direction and control during this investigation.  In November 2017, CS1 introduced CS2 to F. REYES, and CS2 has conducted multiple purchases of drugs from F. REYES and his associates during this investigation.  During these controlled drug deals, investigators were able to identify F. REYES' associates, to include names, addresses, telephone numbers, and modes/methods of operation.  To my knowledge, CS2 has not provided me or any other investigator with any false information about the F. REYES DTO.  For these reasons, I consider the information CS2 has provided regarding the F. REYES DTO to be reliable in this investigation.

27.     CS2 began working with the FBI in November 2011.  CS2's primary motivation for working with the FBI is monetary compensation.  Each of CS2's controlled purchase operations were recorded with audio and/or video recording equipment placed on CS2's person and/or in CS2's vehicle,

Affidavit

1   and corroborated by law enforcement surveillance when possible.  The FBI has not identified any

2   instances of dishonesty or unauthorized unlawful behavior by CS2 during this investigation.  CS2 has

3   provided information on more than 100 targets, in addition to targets presented to the Sacramento

4   County District Attorney's Office for prosecution.  In total, CS2 has been involved in more than 75

5   controlled narcotics and firearms buy operations leading to dozens of successful prosecutions in federal

6   and California State courts.

7   **C.     The TARGET SUBJECTS' Criminal Histories and Roles in the F. REYES DTO**

8       28.     I have identified the TARGET SUBJECTS listed using the following information sources

9   and criminal indices: the California Department of Motor Vehicles (DMV), the California Law

10  Enforcement Teletype System (CLETS), the National Crime Information Center (NCIC), DEA, FBI, and

11  Stockton Police Department's Records Management System (RMS), physical surveillance, conversations

12  with other agents and officers participating in the investigation, and my own participation in the

13  investigation.

14      **1.     *ARREDONDO-GARCIA***

15      29.     ARREDONDO-GARCIA has been identified as a methamphetamine and heroin supplier

16  based on wire intercepts, a controlled drug deal, and a drug seizure.  ARREDONDO-GARCIA's

17  residence has been identified through physical surveillance, commercial database queries, and during an

18  interview as 242 Acacia St, Lodi, CA (ARREDONDO-GARCIA's RESIDENCE).  ARREDONDO-

19  GARCIA is described as a Hispanic male with year of birth 1978; approximately 6'1", 240 pounds with

20  black hair and hazel eyes.  ARREDOND-GARCIA has a California DMV driver's license issued to him,

21  under number ending in 0195, with an associated photo of his likeness dated 2022.    ARREDONDO-

22  GARCIA has no criminal convictions, but has a 2015 arrest for HS 11370, Poss Money/Etc:Sale/Etc Cntl

23  Sub.  During the wiretaps in this investigation, ARREDONDO-GARCIA discussed drug deals and the

24  seizure of 50 pounds of methamphetamine.  His intercepted discussions are consistent with him being the

25  supplier of the drugs in the deals and the 50-pound seizure.

26      **2.     *G. VERDUGO***

27      30.     G. VERDUGO has been identified as a methamphetamine supplier based on wire

28  intercepts and a narcotics seizure.  G. VERDUGO's residence has been identified through physical

Affidavit                                                9

surveillance and commercial database queries as 8626 Carey Ct, Morada, CA (G. VERDUGO's

RESIDENCE).  G. VERDUGO is described as a Hispanic male with year of birth 1983, approximately

5'09", 220 pounds with black hair and brown eyes.  G. VERDUGO has a California DMV driver's

license issued to him, under number ending in 9083, with an associated photo of his likeness dated 2015.

It does not appear that G. VERDUGO has any previous narcotic-related arrests, charges, or convictions.

During the wiretaps in this investigation, G. VERDUGO discussed drug deals with associates including

his brother, J. VERDUGO.

### 3.   *J. VERDUGO*

31.    J. VERDUGO has been identified as a methamphetamine distributor based on intelligence

gained during multiple controlled drug deals, wire intercepts, consensual recorded calls and meetings

with CS2, as well as the seizures of methamphetamine.  J. VERDUGO is currently incarcerated at Avenal

State Prison in Avenal, CA for charges unrelated to this investigation.  J. VERDUGO is described as a

Hispanic male with year of birth 1985; approximately 5'10", 259 pounds with black hair and brown eyes.

J. VERDUGO has a California driver's license issued to him, under number ending in 6945, with an

associated photo of his likeness dated 2019.  J. VERDUGO has a prior criminal conviction for violation

of PC 288(A), Lewd or Lascivious Acts w/Child under 14.

### 4.   *ZAPATA*

32.    ZAPATA has been identified as a drug trafficking facilitator who coordinated the

purchase of load vehicles[2] and arraigned for the shipment of these vehicles through commercial vehicle

transporters.  ZAPATA's role in this investigation was discovered through wiretaps, physical

surveillance, and an interview of ZAPATA.  ZAPATA's residence has been identified through physical

surveillance, electronic surveillance, wiretaps, and commercial database queries as 9709 Fountain Valley

Dr, Stockton, CA.  ZAPATA is described as a Hispanic male with year of birth 1986, 6'01", 199 pounds,

with black hair and brown eyes.  ZAPATA has a California driver's license issued to him, under number

ending in 7389, with an associated photo of his likeness dated 2018.  ZAPATA'S Phone, (209) 275-2975

---

[2] Based on my training and experience, I know that drug traffickers sometimes ship drugs inside
vehicles.  A "load vehicle" is a vehicle they use to conceal these drugs.

Affidavit                                                    10

(TT#3), is serviced by VERIZON WIRELESS.  ZAPATA's criminal history includes violations for PC 242, Battery; PC 148.9(A), False ID to specific peace officers; VC 10851(A), Take veh w/o own consent/veh theft (two convictions); VC 22348(B), Drive in excess of 100 MPH; PC 29800(A)(1), Felon/addic poss/etc firearm; PC 495D(A), Possess stolen vehicle/vessel/etc; and PC 4532(B)(1), Esc jail/etc:charge/etc w/fel (twice).

### 5.  *GODINEZ*

33.  GODINEZ has been identified as a methamphetamine and heroin distributor based on intelligence gathered from physical surveillance and wiretap intercepts.  GODINEZ's residence has been identified through physical surveillance and commercial database queries as 21343 Mission Blvd, Hayward, CA.  GODINEZ is described as a Hispanic male with year of birth 1972, approximately 5'1", 270 pounds, black brown hair, and brown eyes.  GODINEZ has a California driver's license issued to him, under number ending in 1554, with an associated photo of his likeness dated 2016.  GODINEZ's phone. GODINEZ's criminal history includes convictions for violations of VC 10851(A), Take veh w/o own consent/veh theft (three times); PC 459, Burglary:Second Degree (twice); and PC 666, Petty theft w/pr Jail:Spec Offenses.

### 6.  *W. REYES*

34.  W. REYES has been identified as a methamphetamine facilitator based on CS2 reporting, consensual recordings, and wiretap intercepts.  W. REYES' residence has been identified through physical surveillance, electronic surveillance, and commercial database queries as 1117 Mt Etna Ln, Manteca, CA (W. REYES' RESIDENCE).   W. REYES is described as a Hispanic male with year of birth 1974; approximately 5'06", 180 pounds, brown hair, and brown eyes.  W. REYES has a California driver's license issued to him, under number ending in 0512, with an associated photo of his likeness dated 2020.  W. REYES' criminal conviction includes a violation of HS 11357, Unlawful possession of marijuana.  W. REYES' Phone (925) 567-4149, is serviced by VERIZON WIRELESS with the subscriber M.Y.E. of 1117 Mt Etna St, Manteca, CA.

**D.**   **Overt Acts Committed by TARGET SUBJECTS**

**1.**   ***July 10, 2019 – F. REYES sold CS2 1 lb. of methamphetamine supplied by J. VERDUGO***

35.  On July 10, 2019, at the direction of the FBI, CS2 called F. REYES on TT#1 about

Affidavit                                                    11

purchasing one pound of methamphetamine and one ounce of cocaine as part of a controlled drug deal (Session #574 on TT#1).[3]  The purpose of this operation was to identify F. REYES' source of supply (SOS) for drugs.  Calls made between CS2 and F. REYES on this date were obtained through wire intercepts.  Below is an excerpt of the initial conversation that day at 10:01 a.m., in which CS2 told F. REYES (designated as "FR") when he/she would be in Stockton and what type of drugs he/she was looking to buy from F. REYES:[4]

FR:     What's going on, my player?

CS2:    I'm just dropping my daughters off right now at their mom's house and I'm leaving right now.  I'm about two hours from you.  I should be there by 12 o'clock.  For sure, I'll be there by 12 o'clock.

FR:     Ok, let me call this guy right now.

CS2:    Alright, get that shit right now, Bro.  I can't waste this last next trip right here.  I'll be there for sure at 12 o'clock, brother.  I'll call you, I'll call you by like 11 to let you know where I am at on the freeway.

FR:     Ok, then, uh, do you want the one piece, the normal one?  Or do you want the white ones too, the other one?

CS2:    Yeah, I think the white one too, yeah, yeah, both, both.

FR:     Ok, Ok.

CS2:    Same thing as before.

FR:     Ok, Ok.

36.    During this conversation, CS2 told F. REYES when he/she would be in Stockton to meet F. REYES.  F. REYES responded that he would "call this guy right now."  I believe that in this conversation, F. REYES was telling CS2 that he was going to contact his drug supplier to arrange to have the drugs ready for CS2 when CS2 arrived.  Later in the conversation, F. REYES asked CS2 to confirm what type of drugs that CS2 wanted, "the normal one" or "the white ones."  Based on my

---

[3] "Session #" refers to the specific session ID number for a particular call or text that was intercepted during the authorized interception period.  This is being referenced for all intercepted calls in order to help readers reference the original and entire recording.

[4] All conversations between CS2 and subjects in this investigation were made in English.  All other conversations between subjects of this investigation were made in Spanish and transcribed into English.

Affidavit                                    12

training, experience, and knowledge of the investigation, F. REYES was clarifying whether CS2 wanted "the normal one," a coded term for methamphetamine, or "the white ones," a coded term for cocaine.[5]

37.     Approximately eight minutes after completing the above call with CS2, F. REYES made an outgoing call to (209) 898-2593.  This call went unanswered.  Investigative follow-up and surveillance later identified the user of this phone number as J. VERDUGO.[6]  The timing of this call is consistent with F. REYES calling his supplier, J. VERDUGO, because, eight minutes before the call, F. REYES told CS2 he was calling his supplier ("this guy") right after the call with CS2 was completed ("right now").

38.     On that same day (July 10) in Session #582 on TT#1, just 24 minutes after the initial conversation with CS2 described above, F. REYES received an incoming intercepted call from J. VERDUGO (designated as "JV") at (209) 898-2593.  This was the number F. REYES had earlier contacted but the call was unanswered.  Below is an excerpt of that call translated from Spanish:

> FR:    Fuck it! Yes, there--today I was going to need for about 12:30-1:00--one of those that I like and one of the--of the other blondies.
>
> JV:    Yes.
>
> FR:    Yeah, to open a small door there, but, yes to—
>
> JV:    [OV] Yes.
>
> FR:    --get a little more in about two days there, but I was going to cancel with the gentleman--I think that today or tomorrow I'll be getting the-the--that receipt to go out with the gentleman.
>
> JV:    Yes.

[5] I understand this to be the coded terms used by both CS2 and F. REYES because CS2 was told to ask for methamphetamine and cocaine.  Further, the bulk of narcotics CS2 has purchased from F. REYES has been methamphetamine, which is why F. REYES referred to it as "the normal one."  I also know that cocaine is often referred to as "white" because of its white color.

[6] On July 13, 2019, investigators intercepted calls between F. REYES' TT#1 and J. VERDUGO's phone number, (209) 898-2593.  On that day, the users of both phones arranged to meet on two occasions.  During the first occasion, a male later positively identified with J. VERDUGO, drove a black GMC Sierra to meet F. REYES.  The Sierra was registered to a female later identified as J. VERDUGO's girlfriend, with the initials C.C.  During the second occasion, F. REYES was observed meeting with a heavyset male (J. VERDUGO is a heavyset male).  Near the meeting was the same black GMC Sierra observed driven by J. VERDUGO earlier in the day during the first meeting with F. REYES.  As such, I believe that J. VERDUGO was the user of (209) 898-2593.  Subsequent geolocation pings for the phone also showed it consistently located at J. VERDUGO's known residence at 2550 Warlow Lane, Stockton, CA.

FR:   And focus there. Yeah, but this guy comes from far away, and well, he already said he would arrive at 12:00. He talked to me yesterday, but he told me that he would call me in the morning to-to- be really sure, because he's coming from about two and a half hours away.

JV:   Yes. Well, if you want, ah, I can go out--I can only get out at 12:30 during lunch time.

FR:   Yeah, I think that at 12:30 is good.

JV:   And I'll meet you around there.

39.   Based on my training, experience and knowledge of this investigation, I believe that F. REYES is requesting to be supplied drugs by J. VERDUGO in order to fulfill the drug order placed by CS2 for that day.  F. REYES used the coded terms "one of the ones I like" and "the other blondies" to refer to the one pound of methamphetamine and one ounce of cocaine, respectively, which CS2 had ordered.  J. VERDUGO coordinated with F. REYES to meet J. VERDUGO during his lunch break at 12:30 p.m. and described the location where the two would meet.  F. REYES later contacted CS2 and arranged to meet CS2 near J. VERDUGO's workplace.  This conversation, and similar intercepted calls between F. REYES and J. VERDUGO during this investigations, are consistent with my belief that there was an ongoing drug trafficking partnership between F. REYES and J. VERDUGO with J. VERDUGO supplying drugs for further distribution to F. REYES based upon the length of time during which their drug-related conversation were intercepted in this case and the high frequency of sales involving large amounts of methamphetamine.  Moreover, given the ease with which they spoke in coded communications about making drug arrangements at a time when they did not know they were being wiretapped, I believe there was a high level of trust between F. REYES and J. VERDUGO because they were engaged in a high-risk drug trafficking partnership and neither had any difficulty understanding their shared coded language about drug trafficking.

40.   On July 10, 2019, in Session #587 on TT#1, only five minutes after the call between F. REYES and J. VERDUGO, J. VERDUGO used (209) 898-2593 to call F. REYES on TT#1.  Below is an excerpt of that call translated from Spanish:

JV:   Er... Listen, I have small problem.

FR:   Aha, tell me.

JV: Er, [UI] no, the dude is not there right now. ...I can't...

FR: ....with the good looking ones?

JV: Yes,  you have not... I said I would go there quickly, but [person] advised he was not there.

FR: Son-of-a-bitch, *fuck*... how...

JV: That he is not going to be there, and I don't-know-what, and no...

FR: But the other one, yes, right?

JV: Yes, the other one, yes.

(portion of conversation omitted for brevity)

FR: Son-of-a-bitch... No, because... Wait, I 'm leaving... I will see now what I can do. Yes. Otherwise, at least let it be that, it is fine.

41.    Based on my training, experience and knowledge of this investigation, I believe that J. VERDUGO called to tell F. REYES that he was not able to obtain one of the two drugs that F. REYES requested. J. VERDUGO was not able to contact his supplier and thus would not be able to provide F. REYES a specific drug to sell to CS2 that day.  J. VERDUGO did confirm he would have the other type of drug available for F. REYES to sell to CS2.

42.    Surveillance was able to observe F. REYES meet at a location that J. VERDUGO had instructed F. REYES about.  Although surveillance did not see F. REYES with J. VERDUGO during this time, there were two subjects who approached F. REYES' vehicle.  It is possible that when J. VERDUGO instructed F. REYES to meet near his workplace, he also instructed a colleague to bring the drugs out to F. REYES.

43.    Later in the day (on July 10), during the controlled drug deal, F. REYES met with CS2 and was only able to provide one pound of methamphetamine but not the cocaine CS2 had ordered from F. REYES.  With the benefit of hindsight, I believe the intercepted call where J. VERDUGO expresses dismay at not being able to get one of the drugs ordered by CS2 through F. REYES, means that J. VERDUGO was able to obtain methamphetamine for this drug deal but was unable to obtain cocaine to full CS2's order.  The meet between F. REYES and CS2 was recorded.  Below is an excerpt of the conversation CS2 had with F. REYES:

FR: Fuck, man.  The, the, the, the fuckin' guy, he didn't bring me the white one, just, just the one P."

CS2: No, no white girl?

Affidavit                                                   15

1           FR:     No white girl, bro.  I'm sure he can get it today, you're going to have to wait.

44.     This is consistent with the second call J. VERDUGO had with F. REYES, in which J. VERDUGO said he could not obtain the "good looking ones."  Based on what was provided by F. REYES to CS2 and F. REYES' call with J. VERDUGO, I believe that when F. REYES was speaking with J. VERDUGO about the "good looking ones," they were using a coded term for the cocaine that CS2 requested, and which J. VERDUGO was not able to obtain for F. REYES.

45.     The methamphetamine seized (evidence item 1B29) was submitted to the DEA for analysis.  DEA analysis results showed the substance tested positive for Methamphetamine Hydrochloride with a pure substance amount of approximately 422.3 grams.

**2.**     ***August 23, 2019 – F. REYES sold CS2 6 lb. of methamphetamine supplied by J. VERDUGO***

46.     On August 22, 2019, in Session #1305 on TT#1, CS2 called F. REYES to arrange a six-pound methamphetamine purchase for August 23, 2019.  Below is an excerpt of that call:

CS2:     If you want, I'll make it down by 1 or 2, but I'm going to take off early.

FR:     Ok, brother, that's good, that's good.  So you want 3 and 3, right?

CS2:     Yup, 3 and 3.  That's the dillio.

FR:     Ok, I got the one you give me, I got that shit ready so I think I want to find another little one because I don't know when I see you, I give it to you right away like that.

CS2:     Ok, so, yeah you don't need to worry about me bringing you the thing.  Ok, yeah, that'll work that'll be cool as fuck.

FR:     And then you can give me yours and then next time when you come, I have that one ready too.

CS2:     Yup, alright, cool, cool, got it boss.  Sounds good to me, homie.

FR:     Ok, bro.  Call me when you're one hour away, ok?

CS2:     Yup, yup, for sure.  Alright.

FR:     Bye.

CS2:     Gracias [UI].

47.     Based on my training, experience, and knowledge of this investigation, I believe that in this call F. REYES confirmed that CS2 wanted six pounds of methamphetamine separated into two separate spare tires or in F. REYES' words, "3 and 3."  Prior conversations between CS2 and F. REYES

Affidavit                16

involved F. REYES detailing his routine of concealing drugs within spare tires to avoid detection by law enforcement.  F. REYES said he would get a second spare tire so that when CS2 came, the narcotics would already be concealed in the tires.  This way, F. REYES would be able to give the tires with the drugs to CS2 right away without CS2 being required to wait for F. REYES to load the drugs into the tires.

48.     Later that day (August 22), in Session #1333 on TT#1, F. REYES called J. VERDUGO on TT#4.[7]  Below is an excerpt of that conversation translated from Spanish:

JV:     Boss.

FR:     What's up? What's up? How are you? How are you?

JV:     Nothing—doing well.

FR:     Alright, alright. What was I going to say to you? How-how—are you very busy?

JV:     No, no, no—go ahead.

FR:     Look, eh, do you think that you can give me three of those pretty ones?

JV:     Yeah.

FR:     Look, it's to fix the six—the ones I told you that were ugly.

JV:     Ah, okay, okay.

FR:     This buddy of mine will be coming tomorrow—

49.     Based on my training, experience, and knowledge of this investigation, I believe that F. REYES called J. VERDUGO to ask him if he could provide "three of those pretty ones."  Based on the controlled buy on July 10, 2019, I believe that "pretty ones" is a coded term used by this DTO and these two men used coded terms in an ongoing drug trafficking partnership to refer to methamphetamine.  F. REYES further said that the methamphetamine would be for his "buddy" who would be coming the next day (August 23, 2019).  The conversation continued with J. VERDUGO agreeing to drop by F. REYES' shop to drop off the methamphetamine, even though F. REYES would not be there.  Later, video surveillance captured J. VERDUGO's black GMC Sierra drive to F. REYES' laundromat and pull into

---

[7] This intercept was obtained through the order authorizing intercepts of TT#1.  TT#4 was not authorized for interception at this time.

Affidavit                                                17

the storage lot adjacent to the laundromat.  Shortly afterwards, J. VERDUGO's Sierra was seen leaving.  I believe J. VERDUGO drove to the storage lot for the purpose of dropping off the drugs (six pounds of methamphetamine) that F. REYES planned to sell to CS2 the next day.  This evidence is significant because it demonstrates that J. VERDUGO and F. REYES regularly advised each other on the conduct of their drug trafficking business and thus trusted each other in a criminal partnership focused on distributing drugs, especially where J. VERDUGO was comfortable enough dropping off the drugs at F. REYES's shop despite F. REYES not being available or present at the time when J. VERDUGO dropped off the drugs.

50.     On August 23, 2019, (the next day), CS2 called F. REYES and told him that CS2 was 45 minutes away from Stockton.  Prior to this call, surveillance had located F. REYES at his laundromat.  After this call, F. REYES got into his black Ford F-150 and drove into the adjacent storage lot where J. VERDUGO had driven the day before to drop off three pounds of methamphetamine.  Surveillance noticed that while F. REYES was in the storage lot, he was moving in a forward and backward motion similar to that done by technicians when they are removing a tire from a rim.  Shortly afterwards, an unidentified male subject carried two spare tires and loaded them into the back of F. REYES' Ford F-150.  F. REYES left in the F-150 and drove a few blocks away where he met CS2 and gave CS2 the two spare tires.  Agents opened the spare tires later and found six pounds of methamphetamine.



Figure 1: Left and Center: Photo of two spare tires.  Right: Methamphetamine concealed inside the tires.

51.     While J. VERDUGO supplied three pounds of methamphetamine on August 22, 2019, I believe he had previously supplied F. REYES with the additional drugs needed to fill CS2's six-pound order.  This belief is based on the previously referenced conversation in Session #1333, where F. REYES explained to J. VERDUGO why he needed the three pounds.

                FR:     [OV] —and the—and about the other thing—the mother of this dude got sick and

1             he told me to cancel the-the delivery until the following week.  If not, I already-

2             already had arranged it for this one. I don't want to break it. Because—

3     JV:     [OV] Why?

4     FR:     --I can break them, because I will need them anyway, but-but it's that because of

5             that I didn't want to break them.

6     JV:     No, no, no, that's alright. If you want, now—

7         52.     Based on my training, experience, and knowledge of this investigation, I believe that in

8 this call F. REYES was explaining that he had to cancel the delivery of what I believe to be drugs for an

9 unidentified associate since that associate's mother was sick.  F. REYES had additional drugs, enough to

10 supply CS2, however it was already "arranged," or prepared for shipment so F. REYES did not want to

11 break it up in order to take the methamphetamine for that associate to give CS2 the next day.  F. REYES

12 further said that he could break up the shipment for the unidentified associate but would still need more

13 to backfill the drugs destined for that unidentified associate.  J. VEDUGO understood and agreed that it

14 was "alright" for him to provide F. REYES with another three pounds so F. REYES could fill CS2's

15 order the next day and not have to break up the shipment of narcotics destined for the unidentified

16 associate.  These discussions underscore the high level of trust and familiarity that F. REYES and J.

17 VERDUGO had with one another in their drug trafficking partnership.

18         53.     Based on the series of calls beginning on August 22, 2019, continuing through the

19 successful controlled drug deal on August 23, 2019, I believe that J. VERDUGO was the supplier for the

20 methamphetamine that F. REYES sold to CS2.  Although J. VERDUGO only provided three pounds of

21 methamphetamine on August 22, 2019, the above calls demonstrate that J. VERDUGO had previously

22 provided the methamphetamine to F. REYES before delivering the three additional pounds.

23         54.     The methamphetamine seized (evidence item 1B31) was submitted to the DEA for

24 analysis.  DEA analysis results showed the substance tested positive for Methamphetamine

25 Hydrochloride with a pure substance amount of approximately 2,561 grams.

26        **3.**     *August 30, 2019 – F. REYES sold GODINEZ 2 lbs. of methamphetamine and ½ lb. of heroin supplied by J. VERDUGO; Police seize these drugs from GODINEZ during traffic stop*

27

28         55.     On August 30, 2019, in Session #1587, F. REYES used TT#1 to call J. VERDUGO on

Affidavit                    19

TT#4.  Below is an excerpt of that conversation translated from Spanish:

> FR:   All right.  I was going to get--I was--I needed two of those pretty ones, from the first ones.
>
> JV:   Really?
>
> FR:   Like two or three there.
>
> JV:   But... by what time do you need those?
>
> FR:   Well, this guy says that he has enough for a pair, but it's just that he broke one.  And right now he says that he needs some there.  I think the guy is going right now.  And--and later on he's going to let me know about the other little white car.
>
> JV:   Really?
>
> FR:   Sure.
>
> JV:   Okay.  No well, just let me know.
>
> FR:   Well, if you have time right now, I can tell the guy to head over here from there right now.  Do you understand?  And you can drop them off at the shop real quick.  No... or what do you think?
>
> JV:   Uh... Well, let me find out here if I can get away and if I can, I'll call you right away.

56.   Based on my training, experience, and knowledge of this investigation, I believe that F. REYES was calling J. VERDUGO to order two or three pounds of methamphetamine.  I know that when F. REYES and J. VERDUGO speak of "pretty ones," it was their shared coded term to discuss methamphetamine over the phone without overtly using the word "methamphetamine."  F. REYES said that this methamphetamine was for an associate who was coming and had enough money for two pounds. J. VERDUGO said that he would try to get away and drop off the methamphetamine at F. REYES' shop, which I know is a reference to F. REYES' laundromat.  It is important to note that approximately seven minutes prior to this call with J. VERDUGO, F. REYES received an incoming call on TT#1 (Session #1585) from Robert GODINEZ on (510) 266-9010.  Although that call was not monitored, I believe GODINEZ had called F. REYES to order methamphetamine, which caused F. REYES to reach out to J. VERDUGO in this call to try to get the methamphetamine.

57.   Approximately two minutes after speaking with J. VERDUGO, F. REYES made a call from TT#1 to GODINEZ on (510) 266-9010 (Session #1589).  Below is an excerpt of that conversation translated from Spanish:

Affidavit                                    20

1   FR:   How many do you need?

2   RG:   Uh, whatever you can give me so I can work on it.

3   FR:   Okay, you said you have for two, right?

4   RG:   Yes, for two of the nice ones.  I have a broken one right now.

5   FR:   Okay--okay.

6   RG:   It's going out.

7   FR:   Uh, what was I going to tell you?  It's because this guy is working.  So he might get away for a little while or maybe for lunch.  But he'll see he can get away.

8

9   RG:   Yeah.  I can go by in about two hours or [UI] hours.

FR:   I think--let me see if he calls me soon and I'll let you know.  He might come
10        sooner.

11      58.   Based on my training, experience, and knowledge of this investigation, I believe that F.

12  REYES was contacting GODINEZ to update him on his conversation with his supplier, J. VERDUGO.

13  F. REYES confirmed that GODINEZ had enough money to purchase two "of the nice ones."  I believe

14  this is the same "two or three" F. REYES was trying to have J. VERDUGO supply.  F. REYES also told

15  GODINEZ that his supplier was going to try to get away from work, which is consistent with what J.

16  VERDUGO said to F. REYES in the earlier call, "let me find out here if I can get away and if I can..."

17  As such, I believe that F. REYES was trying to get two pounds of methamphetamine from J. VERDUGO

18  in order to sell those two pounds to GODINEZ.

19      59.   Approximately ten minutes later, in Session #1593, F. REYES used TT#1 to call J.

20  VERDUGO on TT#4.  Below is an excerpt of that conversation translated from Spanish:

21      JV:   Oh, okay.  No--no, if you want to do it, we can do it right now.

22      FR:   Okay, right now then.  Right now--look...  more or less where are you going to be?

23      JV:   Well, I'm at work, but can go to--go home and do that.

24      FR:   Okay, because right now I'm dropping off the little girl at school in Weston Ranch

25            and then I'm heading over to the shop.

26      JV:   Really?  How long will it take you to get there?

27      FR:   Look, I'm taking off from here at 8:30.  If you want go by the shop right now.  If

28            you want right now--the--the lady is there.  Just take the soap there.

60.     Based on my training, experience, and knowledge of this investigation, I believe that in this call J. VERDUGO confirmed that he would be able to get away from work and provide F. REYES with the methamphetamine.  F. REYES asked J. VERDUGO to bring the drugs over to the laundromat.

61.     Later on the same day (August 30, 2019), video surveillance captured J. VERDUGO driving his black GMC Sierra to F. REYES' laundromat, where he parked adjacent to F. REYES' truck while F. REYES was inside his truck.  The vehicles were parked adjacent but faced different directions with their passenger sides next to each other.  J. VERDUGO got out of the front driver's seat and walked over to the front passenger side.  There, J. VERDUGO opened his front passenger door and F. REYES' front passenger door and appeared to move something from his vehicle into F. REYES' vehicle.  J. VERDUGO then sat in F. REYES' vehicle.  J. VERDUGO left moments later.  These observed actions, coupled with the context of the intercepted calls, make it clear that J. VERDUGO was delivering methamphetamine to F. REYES for F. REYES to then sell to GODINEZ.

62.     Immediately afterward J. VERDUGO left, F. REYES used TT#1 to call GODINEZ on (510) 266-9010.  F. REYES told GODINEZ to come meet him and to park next to his truck.  Video surveillance captured GODINEZ arriving at the laundromat in a black Mercedes sedan.  GODINEZ got out of his vehicle holding a dark object and sat in the front passenger seat of F. REYES' truck.  After meeting for a period of time, GODINEZ got out of F. REYES' truck and got back into the front passenger seat of his Mercedes while holding a dark object.



Figure 2:  J. VERDUGO standing between his black GMC Sierra and F. REYES' black Ford F-150.



Figure 3: Photo of GODINEZ standing between his black Mercedes and F. REYES' black Ford F-150.

Affidavit                                    22

63.     Surveillance followed GODINEZ away from the location.  GODINEZ traveled west from Stockton in the direction of his residence in Hayward, California.  After passing Tracy, California, a California Highway Patrol unit conducted a traffic stop of GODINEZ's vehicle based upon an observed violation of California law.  During the stop, the officer asked GODINEZ if he was transporting large amounts of cash, weapons, or drugs.  GODINEZ admitted to the officer that he had a "joint," or marijuana, in the center console.  A K9 sniff of the vehicle resulted in a positive alert for the presence of drugs.  A search of the vehicle resulted in the discovery of a black plastic bag containing two separate heat-sealed packages containing suspected methamphetamine (later determined to be a total net weight of 920 grams) and a white plastic bag containing an unknown black substance (later determined to be suspected heroin after closer observation in a controlled environment with a net weight of 212.1 grams).



Figure 4: Photo of items seized from GODINEZ by the CHP to include the two pounds of methamphetamine and ½ pound of heroin.

64.     Based on the series of calls between F. REYES, J. VERDUGO, and GODINEZ, I believe that the methamphetamine GODINEZ possessed in his vehicle during the CHP stop on August 30, 2019, was sold by F. REYES and supplied to F. REYES by J. VERDUGO.

65.     The methamphetamine packages seized (evidence items 1B37 and 1B38) were submitted to the DEA for analysis.  DEA analysis results showed the substance tested positive for Methamphetamine Hydrochloride with a pure substance amount of approximately 432.4 g and 423.2 g, respectively, or an approximate total of 855.6 grams total.  The suspected heroin was field tested and returned a positive presumptive result for the presence of heroin.

Affidavit                                          23

**4.**    *October 7, 2019 – FBI seizure of 50 lbs. of methamphetamine in Omaha, NE involving F. REYES, ZAPATA, J. VERDUGO, and ARREDONDO-GARCIA*

    **a)**    **F. REYES and ZAPATA purchased a load vehicle.**

66.    On September 13, 2019, in Session #2084, F. REYES made a call from TT#2 to ZAPATA on TT#3. In the call, F. REYES told ZAPATA to buy a vehicle for him. Below is an excerpt of that call translated from Spanish:

| | |
|---|---|
| AZ: | Hey. |
| FR: | Hey, man. No way, man! That one is too small. Isn't it, man? |
| AZ: | Uh... we did it the last time with the same one. |
| FR: | Yeah, but it was a lot less. It was hardly anything. This is something bigger. |
| AZ: | Oh, shit! |
| FR: | Look for something--something bigger like that shit I told you about. The--the thing is--is something big, man. It's [UI]. |
| AZ: | It's gonna be--it's gonna be more money. |
| FR: | Yeah, but don't--don't--don't go over a 1000 bucks. |
| AZ: | Huh! I'm not going to find something like that for a 1000. |
| FR: | You can find a piece of shit somewhere. Something that runs. |
| AZ: | I mean, I could--I could get this one for 500 bucks. |
| FR: | Yeah, I know, but fuck! The problem is that there's no space in there. |
| AZ: | Well, you already did one. You already know how much space... |
| FR: | Yeah, but--yeah, but no--no--it wasn't so much, man. And this is very different, man. Oh, let me see if I can remember... Well no, there's hardly any in there, man. <br><br>This is something more or less... it's a different shit with these guys. |
| AZ: | Yeah, but Mr. Cesar can do it there... |
| FR: | Uh... |
| AZ: | He do there [UI]. I mean, whatever can be done there. |
| FR: | No, man! No--no... there's no space in that shit, man. Look for something a little |

1                    bigger, man.  Check to see if you can find something.  If not, we'll figure

2                    something out.

3        AZ:    All right.  It's going to be expensive.

4        FR:    Yeah sure, but not that much.  Something reasonable [UI].  No, that one is too

5               small, man.   We're going to get it and it's not going to work out.

6        AZ:    Fuck!

7        FR:    All right, then.  The Lexus would have been okay.

8        AZ:    Huh?

9        FR:    The Lexus would have been okay.

10       AZ:    Fuck!  All right.

11       FR:    Yeah.

12        67.  Based on my training and experience with this case, I believe that F. REYES and

13  ZAPATA were discussing vehicles with enough room to surreptitiously transport a large load of drugs

14  because, at the end of the conversation, the two discuss how a "Lexus" would accommodate their needs.

15  In this call, F. REYES told ZAPATA to buy a larger vehicle than one that ZAPATA had previously

16  identified.  F. REYES wanted ZAPATA to find a larger vehicle because the shipment of drugs they were

17  planning on concealing in the vehicle was "bigger."  F. REYES told ZAPATA not to spend more than

18  $1,000 on the vehicle.  This is noteworthy because the vehicle F. REYES wanted ZAPATA to find was

19  simply a vehicle that could run.  I believe this type of vehicle was sought for the purpose of saving

20  money, as the vehicle would be used to be loaded with drugs, which it would later be loaded onto a

21  vehicle transporter destined for Nebraska.  I believe that the purpose of purchasing this vehicle was

22  simply to conceal drugs in it without spending so much on the transport vehicle that it would cut into the

23  overall profitability of the overall drug deal.

24        68.  Later, on September 13, 2019, in Session #2110, F. REYES used TT#1 to call J.

25  VERDUGO on TT#4.  In the call, F. REYES asked J. VERDUGO if he had gotten money ("the

26  receipt", which F. REYES would use to purchase a vehicle identified by ZAPATA.  Below is an excerpt

27  of that call translated from Spanish:

28           FR:    What's up?  What's up?  How are you doing?

Affidavit                         25

1 JV: Nothing [UI] here.

2 FR: All right.  All right.  Did you get the receipt yet?

3 JV: Oh, no.  I already--already--already did.  I just left the guy not even two minutes ago.

4 FR: Okay.  It's because this guy was already coming from Manteca.  He's picking me up to go get that thing.

69. Based on my training and experience with this case, I believe that in this call, F. REYES was asking J. VERDUGO for money.  During this investigation, F. REYES has commonly used the word "receipt" to refer to money.  J. VERDUGO said that he had just gotten the receipts as he had left the "guy's" house.  F. REYES needed money because "this guy," who I believe is ZAPATA based on other calls, was picking up F. REYES to "get that thing," which is the vehicle ZAPATA had identified to purchase for the purpose of transporting drugs.  J. VERDUGO and F. REYES made plans to meet at a CVS Pharmacy near F. REYES' house.  During this time, before meeting with J. VERDUGO, F. REYES also made intercepted calls with ZAPATA to arrange to meet so they could drive in one vehicle to buy a Ford Escape, and for one of them to drive the Escape back.

70. Surveillance units watched as J. VERUDGO met with F. REYES near F. REYES' house.  After the meeting, F. REYES went home and waited for ZAPATA.  ZAPATA then picked up F. REYES and drove him to a retail parking lot in Stockton.  The two had arranged to meet an unidentified male who was offering to sell them a vehicle.  Surveillance units saw that the vehicle being sold was an older model silver Ford Escape SUV with paper license plates.  After meeting with the unidentified male, surveillance units saw F. REYES and ZAPATA appear to inspect the Escape, conduct a brief test-drive in the parking lot, and then drive off with the vehicle.  The vehicle was driven and parked in a storage lot adjacent to the laundromat in Stockton that F. REYES owned and operated at the time.[8]

---

[8] Throughout this investigation, F. REYES has stored drugs in the laundromat and the adjacent storage lot.  F. REYES has also had drugs delivered by J. VERDUGO to this location, which has served as a staging area where F. REYES prepared drugs to sell to his distributors and customers like CS2.  For example, on August 22, 2019, F. REYES ordered methamphetamine from J. VERDUGO, who dropped off the drugs in the storage lot.  F. REYES was requesting the narcotics from J. VERDUGO because CS2 had called him and asked to purchase six pounds of methamphetamine.  On August 23, 2019, after CS2 called F. REYES and said that he was close to Stockton, F. REYES went from his laundromat to the storage lot and was seen moving his body in a front and backwards motion similar to an individual using machinery to remove a tire from a wheel.  Minutes later, F. REYES had two spare tires loaded onto his pick-up truck.  F. REYES went directly from the storage lot to the meet location where he gave

1

**b)** **Shipment Destination Provided by J. VERDUGO**

2

71.   On September 14, 2019, in Session #2153, F. REYES used TT#1 to call J. VERDUGO

3

on TT#4.  Below is an excerpt of that conversation translated from Spanish:

4

FR:   Okay.  Yeah, that's fine, that's fine and uh, yeah, look, what he needs [UI] the sooner I have it so that stuff can go out sooner.

5

6

JV:   Yes. Yeah, as soon as they give it to me—

7

FR:   Uh-huh.

8

JV:    And—and I take it to you and give it to you—

9

FR:   Uh-huh, if [UI].

10

JV:   --and so—so we can get that ready.

11

FR:   To set it up because I already have that—that ready, I already know how it's going to be used there and that's it, that—that it's picked up, you know.

12

JV:   Oh, okay, so then as soon as—as they send that back to me I will call you and we can meet so I can give it to you.

13

FR:   Okay, good, fine.

14

JV:   Okay then. Okay.

15

16

72.   Based on my training and experience with this case, I believe that in this call, F. REYES

17

asked J. VERDUGO for the address of where to ship the Escape, which would be loaded with

18

methamphetamine.  J. VERDUGO specifically mentioned that once "they" provided the address to him,

19

he would give it to F. REYES.  F. REYES' role was to get the address and coordinate the shipment of

20

the vehicle.  I believed that J. VERDUGO was working on behalf of someone else.  During this

21

investigation, I identified who J. VERDUGO was working for – it was ARREDONDO-GARCIA.  He

22

was supplying J. VERDUGO with drugs that would be shipped to a location of ARREDONDO-

23

GARCIA's choosing.  I further believe that one of these individuals is ARREDONDO-GARCIA, based

24

on intercepts obtained between J. VERDUGO and ARREDONDO-GARCIA in October 2019, which are

25

26

CS2 the two spare tires containing six pounds of methamphetamine.  As such, I believe that on September 13, 2019, F. REYES parked the Escape at the storage lot because it served as a safe place and a staging area for him to store the Escape and conceal drugs in the Escape.

27

28

Affidavit                                        27

detailed below.

73.     On September 16, 2019, in Session #2224, F. REYES sent a text message from TT#1 to ZAPATA on TT#3.  The message contained the address "12850 L St Omaha, NE 68137 United States." An open source internet search of that address returned with a Walmart at this location.  A short time later, F. REYES used TT#1 to call J. VERDUGO on TT#4.  In the call, F. REYES confirmed that the destination his associates wanted the Escape to be shipped to was a Walmart with the address numbers 12850.

74.     On September 18, 2019, in Session #2238, F. REYES used TT#1 to call J. VERDUGO on TT#4.  Below is an excerpt of that conversation translated from Spanish:

> FR:     And from there--when you're ready there try to make them look small, not too bulky so they can fit nicely.
>
> JV:     Yeah.  Oh, okay.  I'm going to put them in that thing so that everything will go out.

75.     Based on my training and experience with this case, I believe that in this call F. REYES was telling J. VERDUGO how to package the methamphetamine.  F. REYES specifically instructed J. VERUDGO to package "them" to be small so "they" could fit within the Ford Escape.  J. VERDUGO responded that he was packaging the drugs in a way that would allow all of the drugs to be able to fit and "go out" in the shipment.

76.     Later that day, in Session #2239, F. REYES used TT#1 to call J. VERDUGO on TT#4.  Below is an excerpt of that conversation translated from Spanish:

> FR:     Hello.  What's up?
>
> JV:     What's up?  They haven't called you, right?
>
> FR:     Huh?  No, I haven't gotten the call yet.
>
> JV:     No?  Oh, okay.  I'm working hard on that.
>
> FR:     Go for it!  Go for it!
>
> JV:     Yeah. Well, this guy says for me to just grease it really well and... and that's it.
>
> FR:     No, man.  That shit you can't...  Well, I don't know, man.  To each his own.  If I was doing that shit, it would have been on the road a long time ago.  That shit doesn't need so much crap, man.  Just wrap it really well and that's it!
>
> JV:     Yeah, but the problem is that, you see, the way they came...
>
> FR:     Um-huh.
>
> JV:     But...  Well, I just just adding another one and...

Affidavit

28

| | | |
|---|---|---|
| 1 | FR: | Yeah. |
| 2 | JV: | And that was it, double.  I mean, double... |
| 3 | FR: | Well, yeah.  They should have gone out the way they came.  Or okay, you can put a double one, but... but I mean, it's not--not too much of a hassle. |
| 4 | JV: | Or should we sent them out like this? |
| 5 | FR: | Well, the way they are.  I think if they came with double one. |
| 6 | JV: | No, just like that. |
| 7 | FR: | If they came with a double one and it's not easy to tear, just like that.  Remember that I told you that if you wanted you could put tape so they would weigh more. |
| 8 | JV: | Yeah, but I didn't get the fucking tape. |
| 9 | FR: | Well no, just like that, man. |
| | JV: | Oh well, they're done then. |
| 10 | | |
| 11 | FR: | Well, if you want--if you want to put one to each one, that's fine.  But it they came with a double one, fucking send them out like that--like that. |
| 12 | JV: | Well no, they came with a single man.  You see?  But I don't think for that fucking thing [UI]. |
| 13 | FR: | Oh, will they come apart?  No--no [UI], man. |
| 14 | JV: | Oh.  Well, I'll head over there right now then. |
| 15 | FR: | Yeah--yeah.  It's because [UI] |
| 16 | JV: | All right, then. |

77. Based on my training and experience with this case, I believe that in this call J. VERDUGO asked if F. REYES had gotten a call about the status of the arrival of the vehicle transporter, and F. REYES said he had not.  J. VERDUGO said that his associate told him to grease up the packages.  F. REYES suggested an option to secure the packages was to tape them up.  I believe this call was related to F. REYES and J. VERDUGO discussing how to package the drugs.  I believe that J. VERDUGO was told to pack the drugs in small sizes so that they would fit "nicely."  I also know that using grease is a common technique used by drug traffickers to coat their drugs in order to make it more difficult for a canine sniff to be successful in detecting drug odors emanating from within the vehicle.  I also believe that the use of tape is involved in securing narcotics and in attempting to further conceal the odor of narcotics.  In a later call, J. VERDUGO and F. REYES agreed to tape the packaged drugs.  F. REYES told J. VERDUGO to meet him at his laundromat.  Video surveillance captured J. VERDUGO leaving his house with a duffle bag.  Shortly afterwards, J. VERDUGO was seen entering F. REYES'

Affidavit                                               29

1  laundromat with the same duffle bag.  Both men left in J. VERDUGO's vehicle and returned shortly

2  after with F. REYES holding black duct tape in his hand.  After F. REYES and J. VERDUGO returned

3  to the laundromat with the duct tape, surveillance units saw them working on the Escape in the storage

4  lot adjacent to the laundromat.  However, part of the Escape was parked under a canopy, which

5  prevented surveillance personnel from seeing what specifically was being done to the vehicle.

6          **c)**        **Shipment of Escape and Seizure of 50 Pounds of Methamphetamine**

7        78.     Wire intercepts ended for TT#1 and TT#2 on September 20, 2019.  Before the intercepts

8  ceased, intercepted calls revealed that ZAPATA had conveyed to F. REYES that ZAPATA was notified

9  by the vehicle transporting company that the vehicle transporter would not be able to conduct the pick-

10  up in Stockton.  F. REYES relayed these updates from ZAPATA to J. VERDUGO.  The vehicle

11  transporter was delayed for approximately five days.  Intercepted calls also demonstrated that J.

12  VERDUGO and F. REYES made plans to rent a vehicle and drive to Omaha, Nebraska, where they

13  would oversee delivery of the Ford Escape once it reached its destination in Omaha.

14        79.     On September 22, 2019, geolocation pings for F. REYES' phones (TT#1 and TRT#2),

15  and J. VERDUGO's TT#4 showed that all three phones travelled out of Stockton.  The pings showed all

16  three phones moving together to Nevada, and then through Utah, Wyoming, and then eventually

17  stopping in Omaha, Nebraska, on September 23, 2019.

18        80.     On September 23, 2019, FBI Omaha conducted surveillance using geolocation pings for

19  the three phones.  Investigators were also able to locate a rental vehicle rented by F. REYES' girlfriend,

20  with the initials D.O.  The vehicle, a Volkswagen Atlas SUV displaying California license plates, was

21  parked at a Super 8 motel in Omaha, Nebraska.

22        81.     On September 24, 2019, at 11:19 a.m., surveillance personnel positively identified F.

23  REYES and J. VERDUGO at the Super 8 motel.  F. REYES and J. VERDUGO were seen moving roller

24  bags into the Atlas.  The vehicle left the motel and parked at Chepo's Auto Repair at 3601 F Street in

25  Omaha.   The vehicle was later seen stopping at multiple locations.  At around 5:22 p.m., the Atlas was

26  again seen at Chepo's Auto Repair.

27        82.     At 7:32 p.m., surveillance personnel saw the Atlas parked at Walmart located at 12850 L

28  Street.  This is the same Walmart that J. VERDUGO, F. REYES, and ZAPATA referenced on

Affidavit

September 16, 2019, based upon the physical address of 12850 matching earlier intercepted calls where the same street address was discussed as the location for the drug-related meet up.  Approximately five minutes later, surveillance units saw a vehicle transporter on the north side of the Walmart.  Surveillance personnel saw a silver Ford Escape loaded in the middle of the bottom rack of the transporter.  The Atlas moved near the vehicle transporter.  The Escape was offloaded and then loaded onto a flat-bed truck.  The flat-bed loaded with the Ford Escape drove away and stopped at Chepo's Auto Repair.  This is the same location where F. REYES and J. VERDUGO stopped on two occasions earlier in the day.

83.    Hours later, the geolocation pings for F. REYES and J. VERDUGO's three phones showed that their phones traveled west out of Omaha.  The phones continued traveling west through Wyoming, Idaho, Nevada, and then returned to Stockton, California, on September 25, 2019.  I believe F. REYES and J. VERDUGO left Omaha and returned to Stockton because they had successfully overseen the delivery of the Ford Escape loaded with methamphetamine to Chepo's Auto Repair in Omaha, Nebraska.



Figure 5: Photo of the Ford Escape.

84.    On October 9, 2019, a federal search warrant was authorized for the search of Chepo's Auto Repair and the silver Ford Escape.  A search of the Escape resulted in the seizure of approximately 50 pounds of methamphetamine concealed in the spare tire, passenger seats, and a box.



Figure 6: Left: Spare tire with methamphetamine packages concealed inside.  Center: methamphetamine concealed in a cardboard box.  Right: Methamphetamine concealed underneath rear passenger seats.

85.    The packages of methamphetamine seized on October 9, 2019 (evidence items 1B46, 47,

Affidavit

1  and 48) were submitted to the DEA for analysis.  DEA analysis results showed the substance tested

2  positive for Methamphetamine Hydrochloride with a pure substance amount of approximately 10,878

3  grams, 5, 708 grams, and 5,148 grams, respectively, or approximately a total of 21,734 grams.

4         **d)      Identification of ARREDONDO-GARCIA as the supplier of the 50 pounds of**

5                **methamphetamine**

6         86.      During the second 30-day interception period for **TT#1** and **TT#2**, ending on September

7  20, 2019**,** investigators were not able to determine who had supplied J. VERDUGO and F. REYES with

8  the 50 pounds of methamphetamine.  However, after the initiation of intercepted calls over **TT#4** in

9  October 2019, investigators were able to identify ARREDONDO-GARCIA as the supplier for the 50-

10  pound load seized in Omaha.  During this period, agents intercepted multiple calls between

11  ARREDONDO-GARCIA and J. VERDUGO discussing the methamphetamine seized in Omaha.  Those

12  intercepted calls made clear that ARREDONDO-GARCIA supplied J. VERDUGO with the 50 pounds.

13  To the best of my knowledge at the time of the submission of the affidavit for new intercepts,

14  ARREDONDO-GARCIA, J. VERDUGO, G. VERDUGO, and ZAPATA were not aware that the 50

15  pounds of methamphetamine in Omaha has been seized by the FBI.  This may be because the recipient

16  or customer in Omaha who received the drugs, who has not been identified, may have been inclined not

17  to divulge this seizure to J. VERDUGO and ARREDONDO-GARCIA.  It is likely that this individual

18  would face retribution because the payment for the drugs has not been made.  Further, divulging the

19  seizure of the methamphetamine by law enforcement could cause the customer to be alienated from the

20  Target Subjects and also other drug suppliers for fear that law enforcement is investigating the customer.

21  This alienation would make it even more difficult for the customer to pay for the 50 pounds of

22  methamphetamine because they are no longer in a position to be supplied drugs from others.  Whatever

23  the case may be, below are calls demonstrating that ARREDONDO-GARCIA supplied J. VERDUGO

24  and F. REYES with the 50 pounds of methamphetamine that J. VERDUGO and F. REYES arranged to

25  have transported and delivered to Chepo's Auto Repair in Omaha, Nebraska.

26         87.      On October 8, 2019, in Session #444, J. VERDUGO received a call on **TT#4** from

27  ARREDONDO-GARCIA on (209) 313-5331.  The below is an excerpt of that call translated from

28  Spanish:

Affidavit                                     32

1  JA: [OV] [UI] No, well, he's stuck over there and can't—it's because he—he [UI] the
2     thing is that people want 15, 10 and like that, well, and this friend doesn't want to
      do it like that. He wants to give the stuff all at once.

3  JV: Hmm.

4  JA: And, well, that's why he's stuck.

5  JV: Yes, yes.

6  JA: Well, look around also in case you can do something as well. [UI] Listen, I said,
7     "Why did you move if you didn't have anything for sure?"

8  JV: From here, it would have been out already.

9  JA: Yes, fucking, stupid guy.  He didn't move [UI] Listen, everything belonging to us
      is there, also. Well, I [UI] nothing for me, buddy. You know, and everything—
10     everything I have put in is also there and it's his fault.

11  JV: Well, yes. Well, the thing is—that dude that—what he said is that from there,
      well, he can't move anything well, since—well, because his stuff goes further.

12  JA: Yes.

13  JV: And well, since he is not there to start, he needs to start over.

14  JA: But can it go with the rest of it?

15  JV: No, because well, he needs to be there to watch, unless Chepe—Chepe—Unless
16     Chepe wants to do it or somebody from over there and well, nobody is going to
      want to do it.

17  JA: No, but—all of them—all of them—for everything to go, right? --because they
18     don't want anything there.

19  JV: Is that right?

20  JA: That's what I think.

21  JV: No, well, I need to ask him for sure.

22  JA: No, well, it doesn't matter if it takes a month or [UI] buddy, as long as they,
      fucking, went.  If there's 20, and--and just a month, it doesn't matter if it takes
23     two months. Fuck—but as long as they are out of there.

24  JV: Yes. Well, if you want, let me ask right now or by tomorrow--
      [noise]

25  JV: I'm going to call him right now to see him tomorrow instead so that I can talk to
26     him.

27  JA: Make sure and this [UI] well, they can get the vehicle where the fierro is at and
      beyond —Fuck. Put it in there again.

28  88. Based on my training and experience with this investigation, I believe that in this call,

1   ARREDONDO-GARCIA and J. VERDUGO are discussing their belief that the methamphetamine

2   delivered to Chepe's Auto Repair in Omaha ("Chepe") are "stuck."  ARREDONDO-GARCIA said that

3   people wanted to buy 10 or 15 units (which, in context, I believe refers to pounds of methamphetamine)

4   but the seller did not want to sell the drugs in those increments.  Rather, the seller wanted to sell the

5   entire load of drugs together at one time.  As such, the drugs are stuck at this location.  I believe that this

6   and subsequent calls which are detailed show that the narcotics were supplied by ARREDONDO-

7   GARCIA.  The calls are also significant because they demonstrate that ARREDONDO-GARCIA and J.

8   VERDUGO were comfortable enough to discuss and advise each other about the status of the 50-pound

9   load in Omaha and thus trust each other in a criminal partnership focused on distributing a significant

10  amount of methamphetamine as a part of a sophisticated operation using a Ford Escape surreptitiously

11  loaded with drugs in Stockton, transported on a vehicle transporter from Stockton to Omaha, and then

12  offloaded and delivered directly to Chepe's Auto Repair in Omaha for further distribution.

13       89.    On October 10, 2019, in Session #505, J. VERDUGO used **TT#4** to call F. REYES on

14  **TT#1**.  During the intercepted call, J. VERDUGO and F. REYES discussed the shipment of

15  methamphetamine they orchestrated being concealed in the Ford Escape and then transported/offloaded

16  in Omaha.  Below is an excerpt of that conversation translated from Spanish:

17       JV:    Yes. No, well, no, they haven't done anything. So—oh, well they're stopped over
                there.
18
19       FR:    Yeah?

20       JV:    Yes. No, no, well, that, no- no- no- they haven't gotten the ball rolling over there.

21       FR:    Son of a bitch.

22       JV:    That it's because they went to see Chepe and that they wanted to get them in
                amounts of 10—15—like that.
23       FR:    Uh-huh.

24       JV:    He said that no, that all of them or nothing.

25       The conversation continued later:

26       FR:    So then—so then, that problem is there with that system there with—

27       JV:    Yes.

28       FR:    --with the [UI]

Affidavit                                    34

1     JV:     [OV] It's fucked up there.

2     FR:     Shit. No.

3     JV:     And on top of that, some guy went and said, "No, I'm going to take 10 and I'm going to take 5." Chepe said, "You know what? Take them all. If you're going to take some out of it then take it all with the car and everything."

4

5     FR:     Son of a bitch.

6     JV:     "No, they didn't tell me that it was like that." "Well, I don't care. Take all of it or nothing. If not, don't touch it."

7

8     FR:     [OV] It's that—it- it's like—yeah, that's how it is.

9     JV:     Yes.

10     FR:     If some fucker is—no, man, they'll [UI] the guy there and ruin him.
    JV:     And then if they see it…

11     FR:     No, well, imagine, some guy goes there and they take 10, and later on they know it's there, they come at night break in or something… No, no.  Do it all at once and [UI]

12

13     JV:     [OV] No, and they're going to—they would even blame him.

14     FR:     Yes. No, that's what I mean. The guy is humble but not stupid. It's good all at once. No, no, it's tough there in the office.

15

16     JV:     Yeah.

    FR:     Oh, son of a bitch.

17

18     JV:     [OV] And then he told me—

19     FR:     It's a- it's a stoppage—it's a stoppage. That's going to be a huge stoppage and no—

20     JV:     [OV] Yes.

21     FR:     Imagine us if that dude hadn't been there uh—well [UI] huh.

22     JV:     Yes, and—that's what I'm saying. Well, they are going to—it's that they're being foolish.

23

24     FR:     Uh-huh.

    JV:     You know?

25

26     90.     Based on my training and experience with this investigation, I believe that in this call, J.

27 VERDUGO was telling F. REYES that the methamphetamine that they arranged to be transported in the

28 Ford Escape to Omaha were not being sold by the recipient at Chepe's Auto Repair.  J. VERDUGO

Affidavit                35

believes that the reason was that customers of "Chepe" wanted to buy the methamphetamine in
quantities of 10 to 15 pounds as opposed to paying for all 50 pounds at once.  However, as relayed by J.
VERDUGO to F. REYES, Chepe only wanted to sell the entire amount.  This evidence is significant
because it demonstrates that J. VERDUGO is being kept apprised of the developments in Omaha with
the 50-pound load that he helped F. REYES deliver and, based upon his comments expressing
frustration with Chepe not selling the drugs quickly, I believe J. VERDUGO is invested (financially or
otherwise) in the success (or failure) of the 50-pound venture in Omaha.  The call also demonstrates that
J. VERDUGO trusts F. REYES enough to share details of drug-related developments in Omaha and is
keeping him apprised about the status of the large drug shipment made on behalf of the DTO.  In
addition, it is  important to note that the description of events in Omaha with the stalled distribution of
methamphetamine from the 50-pound load matches the description of events with Chepe that
ARREDONDO-GARCIA previously conveyed to J. VERDUGO in Session #444.  As such, what
ARREDONDO-GARCIA discussed with J. VERDUGO in Session #444 is the same as what J.
VERDUGO discussed with F. REYES in Session #505.  F. REYES agreed with Chepe's approach in
selling all the methamphetamine in one sale as opposed to distributing pounds from the load in a
piecemeal fashion because if customers bought portions of the methamphetamine and thus learned
where the entire load of drugs was located (namely, within the Ford Escape), then those same customers
could plot to return at night, break into the business and the Ford Escape, and steal the remainder of the
methamphetamine.  F. REYES also said immediately after that, "No, no, it's tough there in the office."
F. REYES mentioned the "office" which I believe is Chepo's Auto Repair where the FBI seized and
searched the Ford Escape on October 9, 2019.  I believe F. REYES statement, "it's tough there in the
office," further demonstrated his concern about the methamphetamine getting stolen.  Interestingly, the
story being conveyed by "Chepe" to the co-conspirators in Stockton conflicts with the reality that FBI
had already seized the methamphetamine.  However, in my training and experience, drug dealers like
Chepe, who have had their drugs seized by law enforcement, sometimes do not tell their business
partners/drug suppliers about seizures or losses of drug loads and may, instead, pretend there was no
seizure.  This would give drug dealers in Chepe's position more time to obtain money to repay the debt
owed for the large drug load provided on credit.  If the debt could be paid off, this would, in turn, permit

Affidavit

1  people in Chepe's position within the drug food chain to later buy additional drugs from people in

2  ARREDONDO-GARCIA's position in the future instead of terminating the lucrative drug relationship

3  by revealing law enforcement had infiltrated the operation.

4        91.    On October 10, 2019, in Session #510, J. VERDUGO made a call from **TT#4** to F.

5  REYES on **TT#1**.  Below are excerpts of that call translated from Spanish:

6        FR:    No, but the problem is that, look, that shit dries out.  It starts drying out and losing
                volume.

7

8        JV:    Yes.

9        FR:    That sh—yes, that shit—that shit, if the- the- the- with the heat and all that, well,
                it starts losing volume.  That shit starts losing weight.

10        JV:    No, and forget that.  Right there where they're stored—

11        FR:    Uh-huh.

12        JV:    It's really hot.  You know, the sun hits it all day long.

13        FR:    Uh-huh.

14        JV:    Uh-huh, but no, [UI] well, I told you that they both dug in, because one blames
                the other and the other one.

15

16        FR:    No, fuck.  That's messed up, dude. I don't- don't know what to tell you about
                that. How can we shuffle um—no, well, it's that—

17        JV:    [OV] No- no, it's that that's not their problem, you know.

18  The conversation continued with the below:

19        FR:    Look, put some pressure on him. If in two weeks, once that guy pays me, that shit
                is still sitting there, but that's where the problem will be.  That shit is no longer

20               going to be—I mean, [UI] that's fine, the strength.  I'm talking about the- the-
                the- about what—what it drops.

21

22        JV:    [OV] Yes, well, it will drop.

23        FR:    Because it drops. That's not—and you know, more so because—well, I don't
                know how—these that went out were very pampered, but—you know, they spent

24               so much time sitting here, a- like a week. All those two weeks that they were over
                there—three weeks left there, and the extreme heat and all that.

25        JV:    Yes.

26        92.    Based on my training and experience with this investigation, I believe that F. REYES and

27  J. VERDUGO were discussing the status of the 50 pounds of methamphetamine that they believe are

28  still sitting undisturbed at Chepe's Auto Repair in Omaha.  At the end of the intercepted call, F. REYES

Affidavit                            37

1    mentioned that the methamphetamine had been sitting in Omaha for 2-3 weeks.  This timeline matches

2    the known actions of J. VERDUGO and F. REYES in delivering the Ford Escape loaded with

3    methamphetamine to Chepe's Auto Repair in Omaha 17 days prior to this call (corresponding to

4    between two and three weeks).  F. REYES also mentioned that the methamphetamine was drying out,

5    losing volume and losing weight.  FBI Omaha conducted video surveillance of Chepo's Auto Repair

6    during the days before the October 9, 2019, search and discovered that associates at the shop were

7    storing the Ford Escape inside the auto bay at the end of the day and then taking it out in the morning.

8    This behavior occurred consistently over a period of at least three days before the search and likely

9    occurred consistently prior to the video surveillance.  I believe that the reference made by F. REYES to

10   the drugs drying and losing volume is describing the 50 pounds of methamphetamine concealed within

11   the Ford Escape at Chepe's Auto Repair.

12          93.     On October 11, 2019, in Session #550, J. VERDUGO received a call on **TT#4** from

13   ARREDONDO-GARCIA on (209) 313-5331.  Below is the call translated from Spanish:

14          JV:    What's up?

15          JA:    What's up, buddy?

16          JV:    No, nothing.  Just here.

17          JA:    Alright.  Listen, that dude called.  That son of a bitch messed up big time.  I don't
                    know what to say anymore.
18
19          JV:    Yeah?

20          JA :   He asks how much would your friend pay would pay for it over there so, that he
                    can do me the favor with those twenty.
21          JV:    Yeah.

22          JA:    He says he will agree because he understands.  You understand me? That he is
                    not... just something fair... just so...
23
             JV:   Yeah.  Well, let me ask him.
24
             JA:   Yeah.
25
             JV:   Let me call him and I'll let you know what he says.
26
             JA:   Give him a call and let me know what he says.
27
             JV:   All right then.
28
             JA:   Alright.  Bye.

     Affidavit                                                    38

94.     Based on my training and experience with this investigation, I believe that in this call, ARREDONDO-GARCIA was referring to the 50 pounds of methamphetamine he believed was still sitting in the Ford Escape in Omaha.  ARREDONDO-GARCIA asked J. VERDUGO to ask his friend (F. REYES) how much he (F. REYES) would pay for the methamphetamine in Omaha because they were not being sold and were sitting in the Ford Escape.  This call also confirms that ARREDONDO-GARCIA was communicating with the downstream distributor in Omaha and receiving updates about the methamphetamine which were then relayed to J. VERDUGO who, in turn, would convey the status to F. REYES.  From the intercepted comments, I also believe that ARREDONDO-GARCIA provided most if not all of the 50 pounds of methamphetamine on credit to the distributor in Omaha with J. VERDUGO and F. REYES financially invested in the venture and expecting to receive a portion of the money generated by the Omaha distributor selling off the load.

95.     Later that day, in Session #552, J. VERDUGO made a call from **TT#4** to F. REYES on **TT#1**.  Below is an excerpt of that conversation translated from Spanish:

JV:     Oh, no. It's because that dude called me that—well, from the ones that went over there--

FR:     M-hum.

JV:     --what we were taking—

FR:     M-hum.

JV:     --asking if you could at least help with something there.

FR:     Listen, I talked to the buddy and—and I talked [UI] and yes, they want for this to arrive [UI] and work that out quickly and I told them about that number, the entire thing, five-zero.

The conversation continued later with the below:

FR:     Right now there, we're going to have to use Chepe and give him some money.

JV:     [UI]

FR:     And say, "Chepe, you know what, "Take--I'll send someone--" like that--the same—the same like you left it, like that, like that [UI] for a vehicle to go by there, and stop there, arrive there and pick it up to go north.  I—I [UI] the tow truck will take it and—and—and—the problem is that I would pay for the entire trip.  The tow truck would take it, he gets off, it picks it up and let's go. I don't think there will be a problem.

JV:     Well, yes. Well, no—

Affidavit                                                    39

1    FR:    [OV] Uh—uh—

2    JV:    Because right now, the guy was coming this way. I'll tell him about in a little
            while to see—

3

4    FR:    [OV] Really talk to him and tell him.

5    96.    Based on my training and experience with this investigation, I believe that J. VERDUGO

6    called F. REYES after being asked by ARREDONDO-GARCIA in Session #550 to have J. VERDUGO

7    reach out to his associate, F. REYES.  J. VERDUGO advised that he was asking to see if F. REYES

8    could help with "something there," which I believe is a request to have F. REYES help with the sale of

9    the methamphetamine he believed was still sitting in the Ford Escape in Omaha.  F. REYES confirmed

10   that he had already spoken to an associate who wanted the shipment of methamphetamine and would

11   "work that out quickly" or sell the drugs quickly.  F. REYES confirmed that the amount he discussed

12   with the associate was "five-zero," which I believe is 50 pounds, the amount of methamphetamine

13   seized from the Ford Escape.  F. REYES told J. VERDUGO that in order to get the methamphetamine to

14   F. REYES' associate they would have to have Chepe help and would also have to give Chepe some

15   money.  Chepe is likely the associate in Omaha who is in control of the methamphetamine based on

16   prior calls which showed that Chepe did not want to sell the methamphetamine in quantities of 10 to 15

17   pounds.  F. REYES explained that his plan was to have a vehicle transport, or "tow truck," pick up the

18   Ford Escape with the methamphetamine.  F. REYES would have to finance the entire trip to recover the

19   50-pound load from the Ford Escape.  J. VERDUGO advised that "the guy," who I believe is the same

20   individual who asked J. VERDUGO to inquire of F. REYES if he could "help with something there"

21   was coming to meet J. VERDUGO so they would talk.  Surveillance later observed ARRENDONDO-

22   GARCIA arrive at J. VERDUGO's residence.  As such, I believe that this call along with the other

23   above referenced calls indicates that ARREDONDO-GARCIA is the supplier of the 50 pounds of

24   methamphetamine seized on October 9, 2019, in Omaha.

25            **e)    December 7, 2019 – Conversations between J. VERDUGO and J.**

26            **ARRENDONDO after discovering the 50 lb. seizure of methamphetamine.**

27   97.    On December 7, 2019, J. VERDUGO called ARREDONDO-GARCIA after J.

28   VERDUGO had traveled to Omaha to follow up on the status of the 50 pounds of methamphetamine,

Affidavit                                           40

which J. VERDUGO believed was still concealed in the Ford Escape at Chepe's Auto Repair.  After

going to the auto shop where the Ford Escape was concealed and later seized by the FBI, J. VERDUGO

discovered that the vehicle and methamphetamine were seized.  In Session #283 on ARREDONDO-

GARCIA's TT#8, J. VERDUGO and ARRREDONDO have their first conversation since J. VERDUGO

discovered the seizure:

> JV:  Yes, but, no—well, the fact that they're there—well, the truth is that I saw them. You know? I saw the report and all that shit.
>
> JA:  Uh-huh.
>
> JV:  And the—and there's a picture of the truck and everything.
>
> (a portion of the conversation is omitted for brevity)
>
> JV:  It's- it's that the thing—the thing is that they don't even know where from, you know? The car—where it came from.
>
> JA:  Uh-huh. [UI] what's up?
>
> JV:  No, no. No, it's that those cars never said where they came from.
>
> JA:  Uh-huh.
>
> JV:  Well, it can be from California but well, they don't know where from—uh, exactly who, and then, the dude that sent them, well, you know that he died.
>
> (a portion of the conversation is omitted for brevity)
>
> JV:  But the thing is that they don't know how—with cars like that, they don't even know from where. You know? They never know where—where they come from.
>
> JA:  Uh-huh.
>
> JV:  When they come out of the auction, they don't know what the deal is.

98.    Based on my training and experience, I believe that when J. VERDUGO said that he

"saw the report," he was referring to the federal search warrant, which was left at Chepe's Auto Repair

shop.  I assisted in the drafting of the search warrant and know that a photo of the Ford Escape was

included in Attachment A of the search warrant.  I believe that when J. VERDUGO described "a picture

of the truck," he was referring to the photo of the Ford Escape in the search warrant.[9]  J. VERDUGO

and ARREDONDO-GARCIA discuss how law enforcement would not know where the Ford Escape

---

[9] In many investigations, I know that subjects often refer to SUVs as trucks.

Affidavit                                                    41

came from in an effort to reassure themselves that they should not be known by law enforcement to be behind the 50-pound methamphetamine load.  This conversation and similar intercepted calls discussed demonstrate that ARREDONDO-GARCIA, J. VERDUGO, and F. REYES had a high level of trust in one another as part of their ongoing drug trafficking partnership because they are using coded language to discuss the status of a 50-pound methamphetamine load that they now know was seized by law enforcement and, in essence, this call is J. VERDUGO and ARREDONDO-GARCIA warning each other of potential threats from law enforcement posed by the discovery that law enforcement seized drugs they were responsible for obtaining and delivering to Omaha.  Even if it was discovered that the Ford Escape came from California, J. VERDUGO reassures ARREDONDO-GARCIA that law enforcement would not know the origin state or location for the Ford Escape.  Any connection would implicate the shipper, F. REYES, who "died."  This admission further confirms that J. VERDUGO was discussing the Ford Escape that he arranged to have F. REYES and J. VERDUGO place on a vehicle transporter, loaded with 50 pounds of methamphetamine and delivered to Chepe's Auto Repair in Omaha.  Lastly, J. VERDUGO discussed his belief that the Ford Escape would be difficult for law enforcement to connect to him, F. REYES, or ARREDONDO-GARCIA because tracing would be difficult because the Ford Escape came from an auction and, as a result, title or related registration records would not reveal that F. REYES or J. VERDUGO bought the Ford Escape from a third party in Stockton for use in the scheme to distribute 50 pounds of methamphetamine in Omaha.

**f)**      **August 24, 2022 – Interview of J. VERDUGO regarding 50 lbs.**

**methamphetamine seizure on October 7, 2022.**

99.     On August 24, 2022, after reading J. VERDUGO his *Miranda* rights, agents interviewed him at Avenal State Prison.  J. VERDUGO was serving a sentence after being convicted for crimes involving the sexual abuse of children.  I showed J. VERDUGO photos of the methamphetamine seized in Omaha from the Ford Escape.  J. VERDUGO admitted that an El Salvadorean individual, who J. VERDUGO later positively identified through a photo as F. REYES, had paid him $500 to chauffeur F. REYES to Omaha because F. REYES did not have a valid driver's license.  Based on my training and experience, as well as my knowledge of this investigation, I believe J. VERDUGO provided partial truths, admitting he had traveled with F. REYES but minimized his role by stating he was acting as a

Affidavit

"chauffeur." J. VERDUGO also said that the Ford Escape was loaded onto a vehicle trailer in Stockton but, he claimed, he did not see methamphetamine loaded into the vehicle.

100. After denying that he (J. VERDUGO) had supplied the methamphetamine seized, J. VERDUGO eventually acknowledged that he could have unknowingly supplied the methamphetamine to F. REYES. According to J. VERDUGO's story, approximately one week before the loading of methamphetamine into the Ford Escape for transport, F. REYES instructed J. VERDUGO to meet "Gordo," who I believe is ARREDONDO-GARCIA based on the description of "Gordo."[10] J. VERDUGO went to Gordo's residence in Lodi where he (J. VERDUGO) obtained a cardboard box which was sealed with no markings and delivered it to F. REYES. J. VERDUGO acknowledged that the box could have contained drugs but he did not know for certain.

101. I believe J. VERDUGO provided partial truths about his involvement in the shipment of the 50 pounds of methamphetamine while trying to minimize his knowledge of the drugs. J. VERDUGO acknowledged seeing the Ford Escape get loaded on a transporter, traveling to Omaha with F. REYES, and even picking up and delivering a box possibly containing drugs one week prior to the shipment of the Escape. When asked, J. VERDUGO said he would not provide any additional information on "Gordo" advising that it would jeopardize his safety.

**5.** ***October 19, 2020 – FBI seizure of 21 lbs. of methamphetamine in Allentown, PA involving F. REYES, ZAPATA, W. REYES, J. VERDUGO, and G. VERDUGO***

    **a)**     **F. REYES and ZAPATA obtain a load vehicle.**

102. On October 7, 2019, in Session #2052, F. REYES made a call from TT#2 to ZAPATA on TT#3 in preparation for a vehicle purchase later in the day. Below is an excerpt of that conversation translated from Spanish:

        AZ:     I am on my way there, dude.

        FR:     Alright. I am here, man.

---

[10] J. VERDUGO described the male as a Hispanic male, approximately 43 years old, 6'00" tall, 240 to 250 lbs., and had a faded haircut. The location of the male's residence was in Lodi near Highway 99. This description matches that of ARREDONDO-GARCIA's driver's license which listed him as 41 years old, 6'01", weighing 297 lbs. According to Google Translate, "gordo" is a Spanish word for "fat." For these reasons, although other people in this investigation are also referred to as "Gordo," I believe J.VERDUGO was referring to ARREDONDO-GARCIA in this instance.

Affidavit

| | | |
|---|---|---|
| 1 | AZ: | Okay.  Where were you? |
| 2 | FR: | Huh? |
| 3 | AZ: | I need a plate, dude.  Any plate, as long as it is a license plate. |
| | FR: | Well, the the the Nissan one. |
| 4 | AZ: | Yeah. |
| 5 | FR: | Alright then.  Give me a call when you arrive. |
| 6 | AZ: | But it has to be for the rear... |
| 7 | FR: | For a car? |
| 8 | AZ: | For a car. |
| | FR: | Yeah, it's there. |
| 9 | AZ: | Okay. |
| 10 | FR: | Alright.  Bye. |

103.    Based on my training and experience with this investigation, ZAPATA was asking F. REYES to provide a license plate from another vehicle to be used as the rear license plate for another vehicle which ZAPATA and F. REYES would purchase.

104.    Later that day, in Session #2089, F. REYES made a call from TT#2 to ZAPATA on TT#3.  Below is an excerpt of that conversation translated from Spanish:

> FR:    I'm going to follow closely behind you. The only thing is that it doesn't have the front license plate, dude, and that's where we're screwed.
>
> AZ:    Huh?
>
> FR:    The only thing is that it doesn't have a front license plate.
>
> AZ:    I know but just stay right behind me. I should be fine.

105.    Based on my training and experience with this investigation, F. REYES and ZAPATA had just purchased a vehicle.  F. REYES told ZAPATA that he was going to follow behind ZAPATA's vehicle because the vehicle did not have a front license plate.  ZAPATA reaffirmed F. REYES' plan and stated they would be fine.  I believe that ZAPATA accompanied F. REYES to purchase a vehicle.  The license plate that F. REYES had obtained for ZAPATA in Session #2052 was likely used on this vehicle.  However, there was still no front plate.  As such, F. REYES drove closely behind ZAPATA in order to avoid getting stopped by law enforcement for not having a front license plate.  I believe F. REYES and ZAPATA were concerned about being pulled over because the vehicle they purchased

Affidavit                                                    44

1   would be used as a load vehicle to surreptitiously carry drugs.  In the event that the vehicle would later

2   be intercepted by law enforcement, a traffic stop of F. REYES while he was driving the vehicle would

3   connect him to the drugs.  I believe the vehicle purchased and referenced during this intercepted call is

4   an Infiniti QX4 because law enforcement would later seize 21 pounds of methamphetamine from within

5   the Infiniti QX4.

6        **b)      J. VERDUGO supplied F. REYES with 18 pounds of methamphetamine**

7                **from G. VERDUGO**

8        106.    On October 7, 2019, in Session #375, J. VERDUGO received a call on TT#4 from TT#6,

9   a phone later confirmed to be used by G. VERDUGO.[11]  In the call, J. VERDUGO asked to be supplied

10   with methamphetamine.  Below is an excerpt of that conversation translated from Spanish:

11              GV:    How many is it going to be?

12              JV:    Well, if you want to take all of them.

13              GV:    30?

14              JV:    I think it'll be about 21.

15              GV:    Oh...twenty something.  Ok.

16              JV:    Yeah.

17              GV:    It'll be better to keep them stashed away there.

18              JV:    Okay.  Yeah.  We already have them.  We'll send them in the afternoon.

19              GV:    Alright.  Yeah.  I'll do that in the afternoon anyway, dude.

20              JV:    Oh.  Okay.

21              GV:    All right.

22        107.    Based on my training and experience in this investigation, G. VERDUGO was asking J.

23   VERDUGO how much methamphetamine he wanted to get and was confirming whether he wanted 30

---

1.   [11] On October 10, 2019, surveillance personnel set up at G. VERDUGO's business, a taco truck,

    at 313 N. Wilson Way in Stockton.  While surveillance units established visual surveillance of G.

    VERDUGO, a ruse call was made to TT#6, which showed G. VERDUGO answering a phone.

Affidavit                                        45

pounds of methamphetamine.  J. VERDUGO confirmed that he needed 21 pounds of methamphetamine.

G. VERDUGO would have the drugs delivered to J. VERDUGO in the afternoon.

108.    Approximately 20 seconds after ending the above call in Session #375, J. VERDUGO used TT#4 (Session #378) to call to F. REYES over TT#1.  Below is an excerpt of that call translated from Spanish:

> JV:    No, no. He says that uh—that thing [UI] in the afternoon. He says he'll drop it off in the afternoon.
>
> FR:    Alright, yes.
>
> JV:    Yes.

109.    Based on my training and experience with this investigation, J. VERDUGO contacted F. REYES to confirm that his supplier, G. VERDUGO, was going to provide the methamphetamine in the afternoon.  This summary which is consistent with J. VERDUGO's call with G. VERDUGO in Session #375 indicates that J. VERDUGO was obtaining approximately 21 pounds of methamphetamine from G. VERDUGO for F. REYES.

110.    On October 7, 2019, in Session #404, J. VERDUGO received a call on TT#4 from G. VERDUGO on TT#6.  Below is an excerpt of the call translated from Spanish:

> GV:    What's up, Gordo?
>
> JV:    Hey, what did that guy tell you, dude?
>
> GV:    Oh, yes, right now—I think I'm going to do that here in a little bit.
>
> JV:    Yes. Okay, yeah, then tell that guy that it's better tomorrow.
>
> GV:    Oh, but they wanted to do it now?
>
> JV:    No, well he—well, they wanted to show them to him so that he could have a good look at them and all that.
>
> GV:    Oh, okay.
>
> JV:    Because they—because they have to get them ready.
>
> GV:    Yes.
>
> JV:    Because I have to work tomorrow.
>
> GV:    Oh.

Affidavit                                                                46

| | | |
|---|---|---|
| 1 | JV: | I'm going to tell him that tomorrow after I get back from work. |
| 2 | GV: | Or if you want right now—I'll do right now, dude. It's just 6:30. Um, yeah, well then, a little later and— |
| 3 | | |
| 4 | JV: | Yes. No, well, if not, I'll leave them there at the house and then tomorrow morning I'll take—uh, I'll take them to him in the afternoon after work. |
| 5 | GV: | Well, yeah, like that too, right? |
| 6 | JV: | Because we have to get it ready anyway and all that shit. |
| 7 | GV: | Yeah? Oh, okay. Alright, then. |
| 8 | JV: | Yeah. |
| 9 | GV: | How much—uh, hey, what are you going to need? |
| 10 | JV: | Well, take it all, I think. Regardless, those will go—at a minimum it will be some—uh, they'll be—if- if they're good and all that, there will be 20 going out, put together like that. |
| 11 | | |
| 12 | GV: | Oh, okay. |
| 13 | JV: | And the other guy, well, mid-week or at the end of the week he'll take the rest. |
| 14 | GV: | Oh, okay. Alright, then. |
| 15 | JV: | Alright. |
| 16 | GV: | Alright. See you. |
| 17 | JV: | Alright. Bye. |

18    111.    Based on my training and experience with this investigation, J. VERDUGO asked if he

19  would be able to get the drugs for his co-conspirator (F. REYES) so that F. REYES "could have a good

20  look at them."  Drug dealers often like to view the drugs they are purchasing in advance to assess the

21  quality of the drugs being offered in order to determine how successful they will be in turning around

22  and selling the drugs to their downstream distributors.  G. VERDUGO said that he could bring the drugs

23  over later in the day.

24    112.    Later on October 7, 2019, at approximately 8:39 p.m., in Session #418, J. VERDUGO

25  received a call on TT#4 from G. VERDUGO on TT#6.  The call was only 11 seconds in duration

26  because G. VERDUGO was calling to tell J. VERDUGO that he had arrived.  Surveillance confirmed

27  that a Toyota Tacoma pick-up, similar to one known to be driven by G. VERDUGO, arrived at J.

28  VERDUGO's house.  I believe that J. VERDUGO received 18 pounds of methamphetamine from G.

Affidavit                                                    47

VERUDGO during this meeting at J. VERDUGO's residence.  This belief is based upon the call described below in which F. REYES further confirmed that J. VERDUGO got the methamphetamine from G. VERDUGO.

113.    On October 7, 2019, at 8:46 p.m., in Session #423 (approximately 7 minutes after the Toyota Tacoma arrived at J. VERDUGO's residence), J. VERUDGO made a call from TT#4 to F. REYES on TT#1.  Below is an excerpt of that call translated from Spanish:

| | | |
|---|---|---|
| JV: | Hey, what's up? |
| FR: | Nothing much, just hanging out. |
| JV: | Alright. Hey, I have good news and bad news. |
| FR: | Yeah? Let's see, give me the good news and then the bad news. [laughs] |
| JV: | The—well— |
| FR: | Uh-huh. |
| JV: | The problem is that we don't reach our number. |
| FR: | Shit. How many are there? |
| JV: | Eighteen. |
| FR: | Fuck. |
| JV: | Yes and the guy told me that according to him there were 30. |
| FR: | *Fuck.* But are they nice looking? Is it good? |
| JV: | No, well I haven't—I'm—it just arrived so I'm going to check it. |
| | (portion of conversation taken out for brevity) |
| FR: | Hey, what can we do to solve that—19, 20, 21. It— |
| JV: | No, well, I'll work on it tomorrow. I'll start looking for some. |
| FR: | [OV] It would be- it would be three, right? |
| JV: | Yes, well—but I'll start calling around to see what numbers— |
| FR: | Yeah. |
| JV: | --I can get it for. |
| FR: | Yeah, because, *fuck.*  It's so we don't—because that guy, you know that- that I made him a promise because of those green ones—the [UI] that he was trying to get over there. |

Affidavit                                                        48

114.    Based on my training and experience with this investigation, I believe that J. VERDUGO was informing F. REYES that his supplier was only able to provide 18 pounds.  J. VERDUGO's supplier, G. VERDUGO, originally told J. VERDUGO that he had 30 pounds.  It is important to note that just before this call, G. VERDUGO had arrived at J. VERDUGO's residence.  This development is consistent with G. VERDUGO delivering 18 pounds of methamphetamine to J. VERDUGO's house.  F. REYES then asked about what they could do to get the remaining three pounds so that F. REYES would have a total of 21 pounds because it sounds as if the downstream distributor would be expecting around 21 pounds of methamphetamine, not the 18 pounds delivered by G. VERDUGO.  J. VERDUGO advised that he would call around to see if he could get the additional three pounds to get the overall load up to 21 pounds.

c)    **ZAPATA Arranged a Vehicle Transport of a load vehicle on October 9, 2019 at the Request of F. REYES**

115.    On October 8, 2019, in Session #2323, ZAPATA received a call on TT#3 from F. REYES on TT#2.  Below is an excerpt of that call translated from Spanish:

AZ:    What's up, dude?

FR:    What's up, dude?

AZ:    Nah.

FR:    Hey, dude. Can you do me a favor? Um, can you call the- that company, dude, to- to prepare that taxi for the- for that truck? The one for Philly.

AZ:    [OV] It's all ready—already?

FR:    Yeah, dude.

AZ:    *Shit.*

FR:    Call right now, dude. I'll—I'll give you the money later on when I see you.

AZ:    When is payday?

FR:    I'm going to give you some money later on today when I see you.

AZ:    Oh, okay.  Something good?

116.    Based on my training, experience and knowledge of this investigation, F. REYES called ZAPATA in order for ZAPATA to call a company to prepare a "taxi."  I believe this "taxi" is a vehicle

Affidavit                                                    49

1  transporter for "the truck." I further believe that F. REYES clarified that the destination for the truck is

2  "Philly," or Philadelphia. F. REYES advised that he would pay ZAPATA later for his services. This

3  call is significant because it demonstrates that ZAPATA was a trusted participant in the operation of the

4  DTO. Specifically, when F. REYES and J. VERDUGO needed a transport arrangement for the vehicle

5  they planned to load with 21 pounds of methamphetamine for distribution in Pennsylvania, F. REYES

6  trusted ZAPATA to use his contacts to arrange for a vehicle transporter to pick up the load vehicle in

7  Stockton and take it out to Philadelphia. In exchange for ZAPATA using his relationship with the

8  vehicle transporter to assist F. REYES and J. VERDUGO, I believe ZAPATA would expect to receive

9  compensation from F. REYES for his assistance in making the plot to transport 21 pounds of

10  methamphetamine to Pennsylvania for distribution.

11      117.   Within one minute of the end of the above call in Session #2323, ZAPATA sent a text

12  message from TT#3 to F. REYES on TT#2. The text message read, "Adress". Based on my training,

13  experience, and knowledge of this investigation, ZAPATA texted F. REYES in order to ask for the

14  address for the destination of the truck which would be shipped to Philadelphia on a vehicle transporter.

15      118.   Approximately 15 minutes later in Session #2333, F. REYES sent a text message from

16  TT#2 to ZAPATA on TT#3 with the address, "1334 n Nelson st Allentown pa." Based on my training,

17  experience, and knowledge of this investigation, I know that Allentown is a city approximately 64 miles

18  from Philadelphia. I believe this address was the address ZAPATA needed in order to coordinate with

19  the vehicle transport company to send the QX4 loaded with narcotics.

20  //

21

22  //

23

24  //

25

26  //

27

28  //

Affidavit                                              50

1

2      **d)      J. VERDUGO delivered a duffle bag to F. REYES**

2          119.    Later in the day at 4:56 pm on October 8, 2019, surveillance observed J. VERDUGO

3    walking out of the garage at his residence with a duffle bag.  Although J. VERDUGO is partially

4    blocked, he was observed on video carrying a duffle bag with two straps.  Prior to placing the duffle bag

5    into the rear passenger side of his Sierra, he placed the bag on the ground.

6

7

8                              

9

10

11

12
      Figure 7: Photo of J. VERDUGO standing at the rear passenger side bed of his Sierra (below yellow
13                    arrow) with a duffle bag laid on the ground to his left (left of red arrow).

14          120.    Surveillance was established at F. REYES' laundromat which revealed that

15    approximately nine minutes after leaving his residence at 5:05 p.m., J. VERDUGO was observed

16    removing the duffle bag which appeared to be weighted and brought it into the laundromat.  When J.

17    VERDUGO left the laundromat, he threw the duffle bag in the bed of his truck in a manner that

18    suggested it was empty.  I believe the photos below capture J. VERDUGO dropping off the 21 pounds

19    of methamphetamine.  The size and apparent weight of the duffel bag when it was full is consistent in

20    my experience with being able to carry 21 pounds of methamphetamine.

21

22

23                          

24

25

26     Figure 8: Left: J. VERDUGO arriving at the laundromat with a weighted duffle bag.  Right: J.
      VERDUGO leaving the laundromat and holding the empty duffle bag above his head as he places it into
27                                  the bed of his pick-up.

28          121.    The observed actions of J. VERDUGO in connection with the 21 pounds of

Affidavit                                     51

methamphetamine destined for Pennsylvania are similar to the observed actions of J. VERDUGO before the operation to transport 50 pounds of methamphetamine to Omaha.  In particular, before arranging for the  interstate transportation of the 50 pounds of methamphetamine to Omaha, agents observed J. VERDUGO drive directly from his house to F. REYES' laundromat in order to deliver the drugs to F. REYES' shop.  In that instance, J. VERDUGO also carried a duffle bag containing the methamphetamine from his house to the laundromat.

> **e)** **Interstate transportation of a silver Infiniti QX4 on October 9, 2019, containing 21 pounds of methamphetamine**

122.    In the evening of October 9, 2019, ZAPATA made a call from TT#3 (Session #2739) to F. REYES on TT#2.  In the call, ZAPATA provided details about the vehicle transporter's arrival in Stockton.  Below is the conversation translated from Spanish:

> FR:    What's up?
>
> AZ:    Hey, dude, the dude is already there, dude. The driver just called me, and he's already here.
>
> FR:    Where is he?
>
> AZ:    He's right there where—where he went last time. I told him—I told him to give me time, because since he didn't let me know, or anything.
>
> FR:    Uh-huh.
>
> AZ:    I told him to give me about half an hour or so. He said it was fine.
>
> FR:    *Fuck.* I'll head over there right now, then. Alright.
>
> AZ:    Pick you up?
>
> FR:    Yeah, pick me up and let's go.

123.    Based on my training and experience with this investigation, I believe that, in this call, the vehicle transport driver notified ZAPATA that the transporter had arrived in Stockton and was ready to pick up the vehicle (being used by F. REYES and J. VERDUGO to transport 21 pounds methamphetamine supplied by G. VERDUGO).  Referencing back to the Omaha operation, ZAPATA informs F. REYES that the location for the vehicle transporter is the same location when the vehicle transporter picked up the Ford Escape.  ZAPATA and F. REYES agreed to meet and drive together.

124.    Surveillance was established at the Vanco Truck Stop located at 1033 W Charter Way, Stockton, CA.  This is the same truck stop in which CS2 conducted a controlled drug deal with a

Affidavit                                              52

distributor working for F. REYES.[12] Surveillance observed a silver Infiniti QX4 SUV being loaded onto the vehicle transporter arranged by ZAPATA at the request of F. REYES.  Parked nearby, surveillance personnel located a silver Acura sedan with ZAPATA as the driver and F. REYES as the front passenger.  I believe that ZAPATA and F. REYES were present to supervise and make sure that the loading of the QX4 went smoothly.

> **f)** **Death of F. REYES and seizure of 21 lbs. of Methamphetamine from the Infiniti QX4 on October 23, 2019**

125.   On October 18, 2019, (nine days after the shipment of the QX4), intercepts on both TT#3 and TT#4 indicated that F. REYES had died of a heart attack while in his home.  Also on that day, intercepts from ZAPATA's TT#3 indicated that the vehicle transporter was scheduled to deliver the Infiniti QX4 that day.  But, apparently due to the way that information shared between F. REYES and ZAPATA was compartmentalized, J. VERDUGO and G. VERDUGO and the drug dealers in Pennsylvania did not have contact information for each other and thus were not able to communicate to coordinate for the successful delivery of the QX4 to Pennsylvania.  With F. REYES's passing and uncertainty about the fate of the Infinity loaded with 21 pounds of methamphetamine, ZAPATA made the decision to re-route the vehicle transporter and have the Infiniti loaded with drugs returned to Stockton.

126.   On the same day, intercepts between J. VERDUGO on TT#4 (Session # 758) and W. REYES on (510) 930-4633 indicated that W. REYES was trying to get information from J. VERDUGO to coordinate with the drug dealer in Pennsylvania.  Below is an excerpt of that conversation:

> WR:   --well, I don't know what the deal is, man. I need for us to- to talk in person because the guy from up there is calling already, man.
>
> JV:   Yeah?
>
> WR:   And I don't know what the deal is. I don't know anything of what's going on, man. I don't know- the only thing I know—I- my brother trusted me so much that he would talk to me about a lot, and what I do know is that something is going up, but I don't know what is going or what's it going in or anything. You know what I mean? I don't know anything.
>
> JV:   Yes.

---

[12] This controlled narcotics purchase is not being covered in this affidavit.

| | | |
|---|---|---|
| 1 | WR: | I've been- I've been really busy these last days. |
| 2 | JV: | [OV] But- but— |
| 3 | WR: | Uh-huh. |
| 4 | JV: | Yes, well, if you like, we can talk in person and all that, because, well— |
| 5 | WR: | Uh-huh. I— |
| 6 | JV: | [OV] Do you understand? |
| 7 | WR: | Yes, I um— |
| 8 | JV: | [OV] It-it's that, look… |
| 9 | WR: | Uh-huh? |
| 10 | JV: | The truth is that he's—they owe him a lot, you know? |
| 11 | WR: | Uh, yes. |
| 12 | JV: | They owe him a lot of money and— |
| 13 | WR: | Yes. |
| 14 | JV: | And— |
| 15 | WR: | Once again—they're calling me and I think it's this guy from up there that keeps calling, man, but he doesn't answer me, man. |

127.     Based on my training and experience with this investigation, I believe that in this call, W. REYES told J. VERDUGO that the "guy from up there that keeps calling," is the drug dealer who F. REYES intended to receive the QX4 in Pennsylvania. I do not believe that the recipient was calling W. REYES directly but, rather, after F. REYES died, intercepts revealed that W. REYES had taken possession of TT#1. Geolocation ping data showed that the phone ended up in the area of W. REYES' house later that day and into the night. W. REYES was receiving calls from the drug dealer over F. REYES' phone who was trying to contact F. REYES to ask about the delivery of the QX4 with the 21 pounds of methamphetamine. The drug dealer was not answering W. REYES because, I believe, the Pennsylvania drug dealer was suspicious about taking a call from a person that was not F. REYES, but who was somehow using F. REYES' phone. W. REYES also said that his brother, F. REYES, trusted him a lot. I believe W. REYES was trying to tell J. VERDUGO that he knew about F. REYES' drug dealing and wanted to meet with J. VERDUGO to address the issue of coordinating with the

Affidavit                                                54

1  Pennsylvania drug dealer on delivery of the QX4.

2         128.    Intercepts of TT#3 and an interview of ZAPATA conducted on October 29, 2019,

3  revealed that J. VERDUGO, W. REYES, and a subject identified as C.M. (not charged in this

4  complaint), all arrived at ZAPATA's house later that day to gain ZAPATA's cooperation in helping to

5  complete the delivery of the QX4.  J. VERDUGO had access to the Pennsylvania drug dealer through

6  W. REYES' access to TT#1, but he had no way of contacting ZAPATA – the only individual able to

7  communicate with the vehicle transport company.  Intercepts and a subsequent interview of ZAPATA

8  showed that a subject, identified as C.M., knew where ZAPATA lived and brought J. VERDUGO and

9  W. REYES to ZAPATA's house.  ZAPATA said he met with the three men in J. VERDUGO's black

10 GMC Sierra.  ZAPATA said that J. VERDUGO identified himself as "Huero." [13]  After the meeting,

11 ZAPATA contacted the vehicle transporting company and directed it to resume delivery of the QX4 at

12 its original intended destination in Pennsylvania.

13        129.    In the early morning on October 19, 2019, FBI personnel established surveillance in the

14 area of the delivery location of the QX4 in Allentown, Pennsylvania.  Surveillance personnel located a

15 vehicle transporter matching the one observed by FBI personnel in Stockton on October 9, 2019.  The

16 transporter had the same silver Infiniti QX4 loaded on the rear of the top level of the trailer.  The Infiniti

17 QX4 was seized and transported to a secure location.



Figure 9: Photo (left) of the Infiniti QX4 seized in Allentown.  Photo (right) spare tire of the
QX4 which contained 21 pounds of methamphetamine.

 "Huero" is also the name that J. VERDUGO's girlfriend later used to identify J. VERDUGO to CS2
during a controlled buy on November 1, 2019.

Affidavit                                                   55

130.     On October 22, 2019, agents served a federal search warrant for the Infiniti QX4 in the Eastern District of Pennsylvania.  Agents searched the QX4 on October 23, 2019.  The search resulted in the discovery of 21 pounds of methamphetamine concealed inside the spare tire of the vehicle.

 

Figure 10: Photo (left) of spare tire containing methamphetamine.  Photo (right) methamphetamine from the spare tire of the QX4.

131.     The methamphetamine seized in FBI Pennsylvania's case (evidence item 1B1) was submitted to the DEA for analysis.  DEA analysis results showed the substance tested positive for Methamphetamine Hydrochloride with a pure substance amount of approximately 9,399 grams.

### g)     Post-Seizure Phone Conversations

132.     On October 20, 2019, J. VERDUGO used TT#4 to conduct a three-way call between ZAPATA on TT#3 and the driver of the vehicle transporter.[14]  Due to unknown technical reasons, the call was not intercepted.  This call was confirmed through toll records showing a 1:51 minute call occurring at 12:48 p.m., made from TT#3 and the driver's phone number.  A subsequent interview of ZAPATA on October 29, 2019, confirmed that it was during this three-way call when ZAPATA and J. VERDUGO confirmed that law enforcement seized the QX4 in Pennsylvania.

133.     Later that day, in Session #892, J. VERDUGO made a call from TT#4 to W. REYES on (510) 960-4633.  Below is an excerpt of that call translated from Spanish:

>        WR:     Hello.
>
>        JV:     Hey, what's up?
>
>        WR:     What's going on? What's going on? How are you?

---

[14] A subsequent interview of the driver corroborated that the driver received a three-way call from (209) 641-6046 (TT#4), belonging to J. VERDUGO.

1  JV:  Good, good.

2  WR:  Alright, alright.

3  JV:  Here, eh, [UI] report bad things.

4  WR:  Ah?

5  JV:  I have bad, eh, news.

6  WR:  Aha.

7  JV:  No, now this guy has come up with--that they stopped the car.

8  WR:  No fucking way?

9  JV:  Yes.

10  WR:  So then it was that asshole, man.

11  JV:  Yes. Yes, I-I--well, the guy [UI] this guy was the one that-that--I called and talked

12      to the driver and everything, because I thought it was too long, as he should have

13      arrived the day before yesterday.

14  WR:  Aha

15      134.  Based on my training and experience with this investigation, I believe that in this call J.

16  VERDUGO called to inform W. REYES that law enforcement had intercepted the transportation of the

17  methamphetamine-loaded QX4.   W. REYES suspected that it was ZAPATA who had something to do

18  with it.  I believe J. VERUDGO was contacting W. REYES because with F. REYES deceased, W.

19  REYES stepped in to facilitate the drug deal that his brother had initiated.

20      135.  Immediately after this call, in Session #913, J. VERDUGO received a call on TT#4 from

21  G. VERDUGO on TT#6 to further discuss the seizure of the QX4.  Below is an exceprt of that call

22  translated from Spanish:

23  JV:  Hey.

24  GV:  [UI]

25  JV:  In the house.

26  GV:  Yes?  All that problem is still the same?

27  JV:  Yes, dude.

28

1    GV:   [UI], dude.  You haven't met with Panzon's brother?

2    JV:   No, because he told me that he was doing that of—of the—

3    GV:   Yes, I know.  You had told me that—now when he is done with that, see if he can
4          tell you something.

5    JV:   Yes.  Yes, what—no . . . No, no, but what is obvious is that we will recover.  I
           will say that with what we can recover is with that over there.
6

7    GV:   Well yes, [UI] but the problem is that this dude is a smartass.

8    JV:   No, that's why, but we will also do something—

9    GV:   —son of a bitch.

10   JV:   —but also, that dude will not give us the—the papers back.

11   GV:   Yes, but, how can I tell you?  It is a mess.  Fuck, and the problem is that while—
12         how can I tell you?  The fucking pressure is on me, dude.  What the fuck am I
           going to to?
13

14   JV:   Well yes.

15   GV:   What is really fucking me up is that if I only had someplace to put in or
           something else to-to do something or to put it there. Something even from
16         Panzon's loss that I could put in there to-to pacify this dude. Give him--give him
           half and tell him that the rest would be in a few days--when the thing came
17         through from over there.

18

19        136.    Based on my training and experience with this case, I believe that in this call, J.

20   VERDUGO told G. VERDUGO that they would be able to recover from the seizure of

21   methamphetamine supplied by G. VERDUGO.  The fact that G. VERUDGO was the supplier of the

22   methamphetamine seized is further confirmed when G. VERUDGO said that the situation is a mess and

23   that "the fucking pressure is on me."  G. VERDUGO bore the brunt of the pressure from the seizure

24   because he supplied the 21 pounds of methamphetamine to J. VERDUGO on credit and, with law

25   enforcement seizing that load, both G. VERDUGO and J. VERDUGO shared the risk of losing all the

26   money they had anticipated making from getting the drugs to Pennsylvania and sold by the drug dealer

27   out there.  G. VERDUGO said that if only he had some money, even if it came from "Panzon" (who I

28   know to be F. REYES), then G. VERDUGO could "pacify this dude."  Here, I believe G. VERDUGO is

Affidavit                                    58

explaining that he wished he had some money even if the money was from F. REYES' share so that he could provide some money to his supplier to "pacify," or appease, G. VERDUGO's supplier.  I believe this means that G. VERDUGO's supplier provided him with a large portion (likely, 18 pounds) of the methamphetamine seized by law enforcement in Pennsylvania on credit and, in turn, G. VERDUGO would have to figure out a way to make his supplier whole for drugs provided on credit.  In other words, both G. VERDUGO and J. VERDUGO had financial risk in the 21 pounds of methamphetamine seized in Pennsylvania because they now each owed significant drug debts to people in the drug supply chain for this operation.  According to his intercepted comments, G. VERDUGO would like to give half of what is owed and provide the other half when they resumed drugs being transported to Pennsylvania.  This call confirms that G. VERDUGO was the supplier of the 21 pounds of methamphetamine seized in Pennsylvania and that both he and J. VERDUGO planned to continue their ongoing drug trafficking partnership in order to recover from their loss and make whole the supplier above G. VERDUGO.

137.    Later that day, in Session #904, J. VERDUGO made a call from TT#4 to ARREDONDO-GARCIA on (209) 313-5331.  Below is an excerpt of that conversation translated from Spanish:

JV:    No, well, I don't know, because I have another and even worse one now.

JA:    Oh, son of a fucking bitch.

JV:    No, no, no--they stopped that.

JA:    Who?

JV:    No, the car that was on the way . . . They-they got it.

JA:    [UI].

JV:    No, well, you see that this-this guy--well, a car of the-the guy that had sent. The one I had told you was going to work with the guys up north.

JA:    Oh, yes.

JV:    And, yes, they got it.

JA:    Worth shit now.

JV:    Yes, but the guy is around there, because--the problem is that the car was--but it was because things were not done right, you understand?

JA:    Aha. Yes, fucking bitch.

Affidavit                                                        59

1   JV:   Yeah, no [UI].

2   JA:   Over there--where you around that place?

3   JV:   Yes, I went there. No, but the guy says that everything is alright, just that--he says
        they just have to start over again.

4   JA:   Ah, of the same--of the--oh, yes, yes [UI].

5   JV:   When we meet, we can have a long talk.

6

7       138.   Based on my training and experience with this investigation, I believe that J. VERDUGO

8   was breaking the news to ARREDONDO-GARCIA about law enforcement's seizure of the QX4.  J.

9   VERDUGO appeared to blame "the guy that had sent" the vehicle, who I know is ZAPATA.

10  ARREDONDO-GARCIA responded "worth shit now" because, before this call, J. VERDUGO and

11  ARREDONDO-GARCIA discussed that ZAPATA could be used to facilitate future vehicle transports to

12  move drugs across the country.  J. VERDUGO also mentioned that an unidentified male said that

13  everything is alright and that they just have to start over again.  ARREDONDO-GARCIA agreed saying,

14  "yes, yes."  It is unclear who this unidentified male is.  But, based on J. VERDUGO bringing this up and

15  the two individuals then agreeing to meet to discuss the matter, I believe that they intended to regroup

16  and continue their drug dealing.

17              **h)       October 29, 2019, Interview of ZAPATA**

18      139.   On October 29, 2019, during a non-custodial interview of ZAPATA, ZAPATA provided

19  information about the DTO targeted in this investigation.  ZAPATA said that he got vehicles and

20  coordinated transport of those vehicles for F. REYES.  ZAPATA confirmed that he had purchased and

21  helped arrange the transportation of the Ford Escape to Omaha, and the Infiniti QX4 to Allentown.

22  ZAPATA admitted that he was aware that the Infiniti QX4 was seized by law enforcement in

23  Pennsylvania.  ZAPATA said that although he did not know with certainty that drugs were loaded in

24  these vehicles, he knew that F. REYES was involved with drugs and became suspicious of the vehicles

25  that F. REYES had him purchase and transport because of the low value of those vehicles and the high

26  cost of transporting them.  I believe ZAPATA knew about narcotics being concealed within those

27  vehicles but downplayed his involvement to agents during the interview.  ZAPATA also provided the

28  below list of vehicles and their final destinations which he had helped F. REYES transport in the

Affidavit                                  60

1  preceding three months:

2       **a.**  Infiniti SUV to Allentown, Pennsylvania

3       **b.**  Ford Escape to Omaha, Nebraska

4       **c.**  Saturn Aura to Allentown, Pennsylvania

5       **d.**  Ford Fusion to Allentown, Pennsylvania

6       **e.**  Acura TL to Allentown, Pennsylvania

7       **f.**  White Ford Expedition to Allentown, Pennsylvania

8       **g.**  Silver 2004 Range Rover, to Allentown, Pennsylvania

9      140.   ZAPATA said that, after F. REYES' death, three men came to his house to meet with

10  him.  He described these three men as "Huero" (known to agents as J. VERDUGO), F. REYES' brother

11  (known to agents as W. REYES), and "Don Cesar" (known to agents as C.M.).  The three men arrived

12  together in J. VERDUGO's black pick-up truck.  ZAPATA was contacted by these men because they

13  thought ZAPATA had contact with the vehicle transporter responsible for transporting the QX4.

14  ZAPATA said that he felt threatened by J. VERDUGO who said that he (J. VERDUGO) needed to

15  ensure the successful delivery of the drugs in the shipment of the Infiniti QX4 so that nothing would

16  happen to J. VERDUGO's family or ZAPATA's family.  Because of this, ZAPATA who had previously

17  re-routed the transport back to Stockton after F. REYES' death again re-routed the shipment back to its

18  intended destination.  ZAPATA said that "Huero" (J. VERDUGO) gave him a phone number (209) 641-

19  6046 (TT#4) and described "Huero" as a Hispanic male, approximately 38 years old, 5'9", with a beard

20  and a ponytail.  This description matches J. VERDUGO, especially the ponytail.

21      141.   ZAPATA also gave agents F. REYES' brother's phone, (510) 930-4633, and said that he

22  was in his 40s, 5'8" to 5"10", and lived in Manteca, California.  It is important to note that the calls

23  referenced above between J. VERDUGO and W. REYES were captured on W. REYES' phone, (510)

24  930-4633.  All this information is consistent with facts known about W. REYES during this time period.

25      142.   During a second interview with ZAPATA, ZAPATA said that he had recently received a

26  call from (209) 470-4340 (TT#6, used by G. VERDUGO), whose user identified himself as "Huero's"

27  brother (Huero is a moniker used by J. VERDUGO).  I verified this call through phone records showing

28  that G. VERDUGO's phone contacted ZAPATA's phone at or near the time described by ZAPATA.  I

Affidavit

also know that TT#6 is used by G. VERDUGO.  During the call, G. VERDUGO told ZAPATA that all the narcotics that were seized in the "accident" with the Infiniti were [G. VERDUGO's] narcotics."  It is important to note that investigators had not previously discussed G. VERDUGO with ZAPATA.  G. VERDUGO asked ZAPATA to consider facilitating drug transports to Pennsylvania for G. VERDUGO for which G. VERDUGO would pay ZAPATA.

143.   During this second interview, investigators showed photos and ZAPATA was able to identify the following people:

      a.   F. REYES – Identified as "Frank" and "Frank Reyes."

      b.   W. REYES - Identified as "Frank's brother."

      c.   J. VERDUGO – Identified as "Huero."

      **i)   ZAPATA's knowledge of methamphetamine concealed in the QX4.**

144.   Although ZAPATA denied having direct knowledge of F. REYES' drug dealing activities in the interviews, intercepts of ZAPATA's phone demonstrate that he knew drugs were concealed in these vehicles.  For example, on October 18, 2019, after discovering that F. REYES had died, ZAPATA initially coordinated to have the QX4 shipped back to him in Stockton.  As detailed above, ZAPATA eventually called to resume the delivery of the vehicle in Pennsylvania where the vehicle was eventually seized.[15]  After requesting the return of the vehicle by the transport company, ZAPATA had a conversation with an associate identified here only as "J.A." in which ZAPATA detailed his belief that upwards of 40 to 50 pounds of methamphetamine was concealed in the QX4.  Below is Session #6094 on TT#3 which was made in English:

      AZ:    I made the stop.

      JA:    Oh, yeah?

      AZ:    They're going to send that back.

      JA:    Oh shit, how much?

      AZ:    I got to pay, to come back and everything and going, like, 2,600.

      JA:    Is it worth it?

---

[15] In an interview of the driver of the vehicle transporter, he said that he received instructions to return the QX4 back to California and then later received another call instructing him to resume delivery of the QX4 in Pennsylvania.  This corroborates ZAPATA's statements he made to his associate, J.A.

AZ:     There's probably like 40 or 50 of them in there.

JA:     Damn.

AZ:     Yeah.  Let's see if we can make some phone calls, no?  I don't even know what the fuck's in there?

JA:     Oh, you don't know exactly what it is?

AZ:     No and I don't even want to like tell [C.M.] nothing because I don't want [C.M.] to know anything that I got that shit back.

JA:     Uh, what about-

AZ:     So we're going to keep it on the hush, hush.

JA:     You don't know if it's that, nothing, huh, just grass or anything, or other shit?

AZ:     No, it's not grass.  I think it's the window.

JA:     Oh, shit.

AZ:     Yeah, but still I think it's like 40 or 50; that's money still.

145.    ZAPATA told J.A. that he had made the stop and that the transport company was going to send the QX4 back.  ZAPATA paid $2,600 to have it returned.  After J.A. asked if it was worth paying $2,600, ZAPATA responded that there were "probably like 40 or 50 of them in there."  I believe ZAPATA was explaining it was worth the significant cross-country transportation costs because the Infinity likely contained 40 or 50 pounds of methamphetamine (the inference being that absent valuable drugs within the Infinity, there would be no justification for paying $2,600 to have the Infinity returned to Stockton).  ZAPATA later admitted that he didn't know exactly what was in the vehicle but I believe this statement was not an admission that ZAPATA did not know drugs were in the vehicle but rather that he did not know exactly how much drugs were inside the Infinity.  This fact likely results from the structure of the conspiracy in this case in which F. REYES compartmentalized his operation so that, although ZAPATA knew methamphetamine was shipped in the vehicle, he did not know the exact quantity contained within any given vehicle.   Importantly, ZAPATA's intercepted comments confirm his knowledge of the type of drugs even if he did not know the amount.  In particular, ZAPATA affirmatively states that the Infinity does not contain "grass," or marijuana, and, instead, he believed it contained the "window," a coded term to refer to methamphetamine due to its crystalline texture and appearance.  Although ZAPATA overestimated how much methamphetamine was concealed in the

Infinity, the fact that ZAPATA estimated there were 40 to 50 pounds of methamphetamine indicates that he is aware that F. REYES was a large-volume trafficker capable of moving such volume and ZAPATA knew that he was assisting a drug dealer in using his relationship with the car transporter to facilitate the DTO's transportation of drugs from California to other states over great distances.  I also believe ZAPATA took these actions to enrich himself by receiving a fee of some sort from F. REYES in order to make taking the risk of being involved in drug dealing worth it for ZAPATA.  Indeed, if ZAPATA was concerned about facilitating the interstate transportation of drugs for F. REYES, he could have cut himself out of the conspiracy by introducing F. REYES to the vehicle transporter and thus eliminated ZAPATA's risk of being part of the ongoing drug trafficking conspiracy.

**6.**   *November 1, 2019 – W. REYES brokered a 4 lb. methamphetamine deal between CS2 and J. VERDUGO.  J. VERDUGO had C.C. deliver the methamphetamine*

146.   On October 23, 2019, investigators had CS2 send a text message to F. REYES' TT#1. The text message stated, "What's up homie this is criminal this is my new number I got your money too and I need a new load I'm coming down from Oregon."  The purpose of this text was for CS2 to establish communication with W. REYES knowing that W. REYES had F. REYES' phone TT#1 and that W. REYES was going to be involved in F. REYES' drug dealing operation.  These texts were confirmed through a review of tolls for TT#1.  Afterwards, CS2 received an incoming call from (925) 567-4149, which was not recorded but confirmed through toll records.  In that call, CS2 spoke with a male subject who identified himself as "Frank's brother."  This subject was later identified as W. REYES.  W. REYES told CS2 that F. REYES had passed away.  CS2 spoke with W. REYES briefly about how F. REYES had passed.  W. REYES and CS2 agreed to meet with one another so CS2 could pay W. REYES the money owed by CS2 (there was actually no outstanding money owed to F. REYES as this was a ruse to establish contact with W. REYES).  W. REYES also wanted to meet with CS2 so that CS2 and W. REYES could continue to conduct "business," which CS2 understood to mean W. REYES would continue to provide narcotics to CS2.

147.   On October 28, 2019, CS2 met with W. REYES during F. REYES' memorial service. While CS2 was outside meeting with W. REYES, investigators were able to positively identify the

Affidavit                                          64

subject as W. REYES.  During the recorded conversation with W. REYES, CS2 and W. REYES discussed that he (W. REYES) would continue to provide methamphetamine to CS2 for a price of $2,000 a pound.  CS2 and W. REYES agreed that CS2 would contact W. REYES at (925) 567-4149 when W. REYES returned from El Salvador so that CS2 could get drugs from W. REYES.

148.    On October 30, 2019, CS2 reached out to W. REYES at (925) 567-4149 to set up a four pound methamphetamine deal that week.  W. REYES and CS2 communicated via text messages, which were confirmed through toll records and preserved through screenshots of the text thread.  W. REYES told CS2 to contact his associate at (209) 279-8279 (TT#5), who would supply CS2 with the narcotics since W. REYES would not be in the United States.

149.    On November 1, 2019, CS2 made a recorded call to TT#5 asking to meet later in the day to purchase four pounds of methamphetamine.  This call was verified through toll records.  Below is an excerpt of that conversation:

CS2:    Do you want to meet on Tuesday?

JV:    Yeah.

CS2:    Ok, I was going to come down to Stockton today.  I was going to see you today.

JV:    Yeah.  My wife call you.

150.    Based on my training and experience with this investigation, the user of TT#5, who was later identified as J. VERDUGO, said earlier in the call that he was in New York.  CS2 asked if J. VERDUGO wanted to meet and continue with the drug deal on Tuesday when J. VERDUGO returned from New York.  J. VERDUGO said, "Yeah."  After the CS2 again mentioned coming to Stockton, J. VERDUGO said he would have his wife call CS2.  During this conversation, CS2 did not push to have J. VERDUGO find an associate to meet CS2 to conduct the drug deal because J. VERDUGO was in New York.  Rather, it was J. VERDUGO who initiated the idea of having his wife call CS2 to arrange for the drug deal.  This is further confirmed in the following call that CS2 received.

151.    Approximately four minutes later, CS2 unexpectedly received a call from an individual who self-identified as "Huero's wife."  This call was verified through toll records.  Carrier records show the subscriber for this number as "C.J.C."  Based on surveillance and database checks, I know that J. VERDUGO lives with C.C. who I believe is C.J.C. in the subscriber records.

152.    Because I believe C.C. was speaking with CS2 and for the reasons stated above, I also believe TT#5 was being used by J. VERDUGO.  This is so because during the October 29, 2019, interview with ZAPATA, ZAPATA said that the person who provided him with (209) 641-6046 (TT#4) self-identified as "Huero," which is the same moniker C.C. said belonged to her husband.  ZAPATA also identified "Huero" as having had a beard and a ponytail, which I know J. VERDUGO has had since he was first identified in this investigation.  In addition, after listening to several recorded calls between CS2 and the person using TT#5, and a comparison with J. VERDUGO's voice as intercepted on TT#4, leads me to believe that the person using the phone (J. VERDUGO) was the same person.  Lastly, geolocation (GPS) data for TT#5 consistently showed the phone in the area of J. VERDUGO's home address in Stockton, California.

153.    During the conversation between C.C. and CS2, C.C. said that J. VERDUGO would be back on Wednesday.  C.C. also said, "I have everything for you" which CS2 understood to mean that C.C. would supply drugs for CS2.  C.C. also asked CS2, "if you want me to see or you want to wait for him?"  CS2 understood C.C. to be asking whether CS2 wanted to conduct a drug deal with C.C. that day or wait until her husband, J. VERUDGO, returned to Stockton.  CS2 said that he would meet with C.C. that day.

154.    CS2 met C.C. at In-N-Out Burger located at 2727 W. March Lane in Stockton, California.  C.C. was driving a Mazda SUV at the time.  She arrived at the meet location at 1:58 p.m.  I was watching live video surveillance of J. VERDUGO and C.C.'s house at 2550 Warlow Lane in Stockton.  Before the drug deal, surveillance saw a Mazda SUV which has been previously identified in this investigation.  The Mazda SUV left the house at 1:43 p.m.  The trip from the house to the drug deal took approximately 15 minutes, indicating that C.C. likely did not make any stops but had gotten the drugs for CS2 from her and J. VERDUGO's house.

155.    During the meeting, which was audio and video recorded, C.C. said, "Huero said, Huero's my husband, he say that he work with you the same as Frank."  CS2 later explained that he/she understood this to mean that "Huero," or J. VERDUGO, agreed to continue the same arrangement that F. REYES previously had with CS2 for drug deals.  CS2 explained to C.C. that he/she had arrangements with F. REYES in which CS2 would pay for half of the drugs up front and have the other half fronted,

Affidavit

that is, provided on credit.  CS2 gave $4,000 to C.C. in exchange for four pounds of methamphetamine.  At $2,000 per pound, CS2 told C.C. that he/she would later pay off the remaining two pounds ($4,000) in the future.

156.    After CS2 completed the controlled drug deal, investigators provided CS2 with a 2015 DMV photo of C.C.  CS2 positively identified the person in the photo as the person who he met at the In-N-Out.  Agents also reviewed audio and video recording of the meet and were able to positively identify the woman who gave CS2 the four pounds of methamphetamine as C.C. based on that same 2015 DMV photo.



Figure 11: Photo of four pounds of methamphetamine provided by J. VERDUGO, delivered by C.C.

157.    The methamphetamine seized (evidence item 1B54) was submitted to the DEA for analysis.  DEA analysis results showed the substance tested positive for Methamphetamine Hydrochloride with a pure substance amount of approximately 1,753 grams.

**7.      *December 11, 2019 – J. VERDUGO sold CS2 ½ lb. heroin supplied by ARREDONDO-GARCIA and delivered by C.C.***

158.    On December 11, 2019, J. J. VERDUGO received a call on TT#5 from CS2.  CS2 called at the direction of investigators to request one pound of heroin for a controlled drug deal in order to identify J. VERDUGO's heroin supplier.  Shortly after in Session #360, J. VERDUGO used (209) 641-5049 to call ARREDONDO-GARCIA on TT#9. Below is an excerpt of that conversation translated from Spanish:

JV:    Really? Um, do you remember I told you about the guy from Oregon?

JA:    What?

JV:    Do you remember I told you about a guy from Oregon?

JA:    Yeah.

Affidavit                                                  67

1   JV:    Uh, the guy was asking me if – about the chocolate kind, if—

2   JA:    What about it?

3   JV:    Well, about the chocolate kind.

4   JA:    Mm-hmm.

5   JV:    If – how much it costs.

6   JA:    Well, buddy, that kind is about 16 bucks, buddy. That stuff just went up.

7   JV:    Really?

8   JA:    It's going up.

9   JV:    Oh, alright.

10   (portion of conversation taken out for brevity)

11   JV:    Uh, how much do you think – do you think I should sell it for?

12   JA:    At least seven five, buddy. Seven— seven five.

13   JV:    Oh, yeah? OK.

14   JA:    Seventeen, seventeen five.

15   JV:    Oh. Well, let me call him and see what he says.

16   159.   Based on my training, experience and knowledge of this investigation, I believe that

17   ARREDONDO-GARCIA quoted J. VERDUGO $16,000 for a pound of heroin.  This is a price that

18   ARREDONDO-GARCIA was charging J. VERDUGO.  J. VERDUGO asked what price J. VERDUGO

19   should charge CS2 to build in some profit from the sale of heroin.  ARREDONDO-GARCIA suggested

20   charging $17,000 or $17,500 and, in that way, J. VERDUGO would realize a profit of either $1,000 or

21   $1,500 for each pound of heroin sold to CS2.

22   160.   Approximately ten minutes later in Session #261, J. VERDUGO received a call from CS2

23   over TT#5.  J. VERDUGO used his girlfriend, C.C., to discuss details with CS2 about the heroin that

24   CS2 had requested.  Below is an excerpt of that conversation:

25   CC:    I have a question.  You want the whole?

26   CS2:   Yeah, yeah.  I was gonna say, yeah, yeah.  How long before he can get it?   How
        long is it going to take him cause I'll be down there soon.  And how much is it
27        going to be?

28   CC:    [Background conversation in Spanish]  He said 17 and a half.

Affidavit                                    68

CS2:   Uh, ok, ok, shit.  Ok, how long before he can get it?  How long is it going to take him?

CC:    [Background conversation in Spanish]  I'm ready.  He's ready.

CS2:   Ready now?

CC:    Yeah.

CS2:   Ok, ok, alright, umm, umm.  Is it, is it possible that I, ask him if I could pay for half and then when I come back I could pay him for the other half.  Cause I have all your money and then I want to pay for half of that and then come back and pay him for the other half; just like we did the other.

CC:    [Background conversation in Spanish]  He says for the, for the negro, he can't because no is, not hers, yeah.  But he say give it to you the half.

161.   Based on my training, experience, and knowledge of this investigation, J. VERDUGO utilized C.C. to translate with CS2.  C.C. quoted a price of $17,500 for one pound of heroin; this was in the upper range of prices which ARREDONDO-GARCIA suggested J. VERDUGO charge CS2.  C.C. also confirmed that J. VERDUGO would not be able to provide half of the heroin on credit to CS2 because the heroin (unlike the methamphetamine) did not belong to him.  This statement, along with J. VERDUGO's call to ARREDONDO-GARCIA in Session #360 over TT#9, further corroborates that the heroin belonged to ARREDONDO-GARCIA.  CS2 agreed to purchase a half pound of heroin from J. VERDUGO for $8,750.

162.   J. VERDUGO met with CS2 and brought CS2 to the storage lot adjacent to F. REYES' laundromat where J. VERDUGO was stashing his drugs.  During the drug deal, CS2 also paid $4,000 to J. VERDUGO for methamphetamine which J. VERDUGO had previously fronted to CS2 on November 1, 2019, and $8,750 for a half pound of heroin.

163.   The heroin seized (evidence item 1B55) was submitted to the DEA for analysis.  DEA analysis results showed the substance tested positive for heroin (calc. as Hydrochloride) with a pure substance amount of approximately 127.9 grams.

E.     **Probable Cause for Residences and Phone Numbers**

1.     *Probable Cause to Believe that ARREDONDO-GARCIA Currently Resides at ARREDONDO-GARCIA's Residence*

164.   The Ninth Circuit holds that an agent must have probable cause to believe that the person he is attempting to arrest, with or without a warrant, is in a particular building before entering a place by

Affidavit                                                   69

ruse or any other means. *United States v. Gorman*, 314 F.3d 1105, 1113 (9th Cir. 2002). In this case, the facts detailed below demonstrate probable cause to believe the Target Subjects reside in the locations detailed and are using the phones described below. This affidavit therefore respectfully requests authority to enter the residences described in order to effectuate execution of the arrest warrants sought by this affidavit.

165.    On September 22, 2022, agents conducted an interview of ARREDONDO-GARCIA at 242 Acacia St. Lodi, CA. During the interview, ARREDONDO-GARCIA identified 242 Acacia St. as his residence.

166.    On May 23, 2023, surveillance was conducted at 242 Acacia St, Lodi, CA. At approximately 3:47 AM, surveillance observed three vehicles parked on the driveway. All three vehicles are registered to ARREDONDO-GARCIA. At approximately 5:49 AM, agents observed ARREDONDO-GARCIA depart from the residence and drive off in one of the three vehicles.

167.    Based on the above facts and my training and experience, I believe that ARREDONDO-GARCIA is residing at 242 Acacia St., Lodi, CA 95240.

### 2.    *Probable Cause to Believe that ZAPATA Currently Resides at ZAPATA's Residence and is Using ZAPATA'S Phone.*

168.    On May 10, 2023, surveillance observed ZAPATA at 9709 Fountain Valley Dr, Stockton, CA. The residence was ZAPATA's residence as far back as 2019 during the wiretap portion of this investigation.

169.    On May 22, 2023, your affiant made a call to ZAPATA'S Phone, (209) 275-2975, to discuss a future interview. ZAPATA also confirmed that he was living at the same residence. Based on the above facts, I believe that ZAPATA is using ZAPATA'S Phone, (209) 275-2975 and is residing at ZAPATA'S RESIDENCE located at 9709 Fountain Valley Dr, Stockton, CA.

### 3.    *Probable Cause to Believe that W. REYES Currently Resides at W. REYES' Residence and is Using W. REYES' Phone*

170.    On June 1, 2023, your affiant made phone calls with W. REYES' phone under a ruse. This is one of the phones which W. REYES was intercepted using during the wiretap portion of this investigation in 2019. During the ruse call, a male who identified himself as W. REYES confirmed that

Affidavit                                                        70

his phone number is (925) 567-4149 and that his residence is 1117 Mt Etna Ln, Manteca, CA.  Carrier

records for the phone show that it has been active since August 11, 2019, with the subscriber M.Y.E. of

1117 Mt Etna St, Manteca, CA.  During the ruse call, a female who identified herself as M.Y.E.

confirmed that W. REYES is her husband.

171.    Based on the above facts, I believe that W. REYES is using (925) 567-4149, W. REYES'

Phone, and is residing at 1117 Mt Etna Ln, Manteca, CA (W. REYES' RESIDENCE).

## IV.    TRAINING AND EXPERIENCE REGARDING CELLULAR TELEPHONES AND PRECISE LOCATION DATA

172.    In my training and experience, I have learned that T-Mobile, AT&T, and Verizon are all

companies that provides cellular telephone access to the general public.  I also know that providers of

cellular telephone service have technical capabilities that allow them to collect and generate information

about the locations of the cellular telephones to which they provide service, including E-911 Phase II

data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face

information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location

information about the cellular telephone itself, either via GPS tracking technology built into the phone or

by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site

data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a

radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to

which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas,

and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does

not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less

precise that E-911 Phase II data.

173.    Based on my training and experience, I know that these carriers can collect E-911 Phase II

data about the location of the Target Cell Phone, including by initiating a signal to determine the location

of the Target Cell Phone on their network or with such other reference points as may be reasonably

available.

174.    Based on my training and experience, I know that these carriers can collect cell-site data

about the Target Cell Phone.  Based on my training and experience, I know that for each communication

Affidavit

1    a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the

2    communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer

3    connected at the beginning of the communication; (4) the cell tower to which the customer connected at

4    the end of the communication; and (5) the duration of the communication.  I also know that wireless

5    providers typically collect and retain cell-site data pertaining to cellular devices to which they provide

6    service in their normal course of business in order to use this information for various business-related

7    purposes.

8    **V.    AUTHORIZATION REQUEST REGARDING APPLICATION FOR WARRANTS TO
         OBTAIN PRECISE LOCATION DATA FROM A CELLULAR TELEPHONE**

9

10      175.    Based  on the foregoing, I request that the Court issue the proposed search warrant,

11   pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

12      176.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal

13   Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days

14   after the collection authorized by the warrant has been completed.  There is reasonable cause to believe

15   that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C.

16   § 2705.  Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously

17   jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to

18   destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  See 18

19   U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the

20   proposed search warrant does not authorize the seizure of any tangible property.  See 18 U.S.C. §

21   3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic

22   communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is

23   reasonable necessity for the seizure for the reasons set forth above.  See 18 U.S.C. § 3103a(b)(2).

24      177.    I further request that the Court direct the respective carriers to disclose to the government

25   any information described in Attachment B that is within the possession, custody, or control of the

26   respective carriers.  I also request that the Court direct the respective carriers to furnish the government

27   all information, facilities, and technical assistance necessary to accomplish the collection of the

28   information described in Attachment B unobtrusively and with a minimum of interference with the

Affidavit
                                          72

1  respective carriers' services, including by initiating a signal to determine the location of the Target Cell

2  Phone on the respective carriers' network or with such other reference points as may be reasonably

3  available, and at such intervals and times directed by the government.  The government shall reasonably

4  compensate the respective carriers for reasonable expenses incurred in furnishing such facilities or

5  assistance.

6     178.   I further request that the Court authorize execution of the warrant at any time of day or

7  night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

8                        **VI.   REQUEST FOR SEALING**

9     179.   It is respectfully requested that this Court issue an order sealing, until further order of the

10  Court, all papers submitted in support of this application, including the application and search warrant. I

11  believe that sealing this document is necessary because the items and information to be seized are

12  relevant to an ongoing investigation into the criminal organizations as not all of the targets of this

13  investigation will be searched at this time.  Based upon my training and experience, I have learned that

14  online criminals actively search for criminal affidavits and search warrants via the Internet, and

15  disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online

16  through the carding forums.  Premature disclosure of the contents of this affidavit and related documents

17  may have a significant and negative impact on the continuing investigation and may severely jeopardize

18  its effectiveness.

19

20

21

22

23

24

25

26

27

28

Affidavit                                        73

## VII.   <u>CONCLUSION</u>

180.    Based on my training, experience, and the information contained within this affidavit, I believe that probable cause exists to believe the TARGET SUBJECTS committed the TARGET OFFENSES.

181.    Also based on the foregoing, I submit there is probable cause to search the locations described in ATTACHMENTS A-1 through A-5 for the items described in ATTACHMENTS B-1 through B-5.  I also submit that there is probable cause to arrest the TARGET SUBJECTS for violations of the TARGET OFFENSES described in the table above.

Respectfully submitted,

/s/
_____
BRIAN TOY
Special Agent
FBI

Subscribed and sworn to me via telephone on:   June 13, 2023

_____
Hon. Carolyn K. Delaney
U.S. MAGISTRATE JUDGE

/s/ Adrian T. Kinsella
_____
Approved as to form by AUSA ADRIAN T. KINSELLA

In addition, with regard to the request for warrants to obtain precise location data from the target cellular telephones, to ensure technical compliance with 18 U.S.C. §§ 3121-3127, I also request that this warrant shall also function as a pen register order.  I thus certify that the information, under oath, that likely to be obtained is relevant to an ongoing criminal investigation conducted by the FBI, based on the agent's affidavit herein.  *See* 18 U.S.C. §§ 3122(b), 3123(b).

Affidavit

<u>**United States v. ROBERT GODINEZ**</u>
**Penalties for Criminal Complaint**

<u>**COUNT 1:**</u>                                                     2:23-mj-0091 CKD

VIOLATION:          21 U.S.C. §§ 846, 841(a)(1) - Conspiracy to Distribute Over 500 Grams of
                    a mixture containing Methamphetamine

PENALTIES:          Mandatory minimum of 10 years in prison and a maximum of up to life in
                    prison; or
                    Fine of up to $10,000,000; or both fine and imprisonment
                    Supervised release of at least 5 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)

<u>**COUNT 2:**</u>

VIOLATION:          21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute at least 100
                    Grams of a mixture containing Methamphetamine

PENALTIES:          Mandatory minimum of 5 years in prison and a maximum of up to 40
                    years in prison; or
                    Fine of up to $5,000,000; or both fine and imprisonment
                    Supervised release of at least 4 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)

AO 442 (Rev. 11/11) (modified) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern   District of   California

United States of America
v.

ROBERT GODINEZ

_____
*Defendant*

)
)
)
)
)
)

Case No.     2:23-mj-0091 CKD

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   ROBERT GODINEZ ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☒ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute of at least 500 grams of mixture or substance containing a detectable amount of Methamphetamine

21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute of at least 100 grams of a mixture or substance containing a detectable amount of heroin

Date:   June 13, 2023

_____
*Issuing officer's signature*

City and state:   Sacramento, CA

Carolyn K. Delaney, United States Magistrate Judge
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____         _____ *Arresting officer's signature* |
| _____ , United States Magistrate Judge *Printed name and title* |